ILLINOIS POWER COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28136-84.        Filed December 23, 1986.

---

[5] But see *Fulton Gold Corp. v. Commissioner*, 31 B.T.A. 519 (1934).
[6] See H. Rept. 586, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 357, 377.

*Edward C. Rustigan* and *William A. Schmalzl*, for the petitioner.

*Matthew J. Fritz*, for the respondent.

KÖRNER, *Judge*: Respondent determined a Federal income tax deficiency against petitioner for the taxable year ended December 31, 1981, in the amount of $4,543,330.80.

After concessions, the issues remaining for decision are: (1) Whether petitioner's transfer of 50 percent of the common stock of Illinois Power Fuel Co. to Millikin University on February 2, 1981, should be disregarded so that Illinois Power Fuel Co. is considered a member of its "affiliated group" for purposes of petitioner's consolidated return; (2) whether a transfer of nuclear fuel by petitioner to Illinois Power Fuel Co. on February 2, 1981, which was cast as a sale-leaseback was in reality a financing arrangement for Federal tax purposes; (3) whether petitioner is entitled to deduct the liability it accrued for lease charges in connection with the transfer of the nuclear fuel; and (4) whether petitioner received interest income in connection with the transfer of the nuclear fuel.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

### General Background

Petitioner is an Illinois corporation with its principal office at Monticello, Illinois, and its executive office at Decatur, Illinois. For the taxable year ended December 31,

---

[1]At trial herein, an unrelated issue was severed and will be disposed of by further proceedings after the present issues are decided.

1981, petitioner filed a U.S. Corporation Income Tax Return (Form 1120) using the accrual method of accounting.

Petitioner has been, at all times herein pertinent, a public utility subject to regulations of the Illinois Commerce Commission (ICC) and the Federal Energy Regulatory Commission (FERC). During the year in issue, petitioner was engaged in the manufacture and sale of electric power to areas in central and southern Illinois.

During 1981, petitioner owned an 80-percent undivided interest in a nuclear power plant (known as the Clinton Power Station) presently under construction near Clinton, Illinois. The remaining ownership was held by Western Illinois Power Cooperative and Soyland Power Cooperative.

Construction of the Clinton Power Station began with site preparation in 1975. Heavy construction commenced in 1976. Petitioner's total investment in the Clinton Power Station is expected to exceed $2.7 billion. The cost of the initial core of nuclear fuel for the Clinton Power Station is approximately $125 million.

Nuclear fuel is a custom made product that can only be used in the plant for which it was designed. The process of obtaining nuclear fuel by a utility requires the acquisition of raw uranium, the enrichment of the uranium, and the fabrication of fuel assemblies. Prior to 1981, petitioner had entered into contracts with Kerr-McGee Nuclear Corp. for the purchase of raw uranium, with the U.S. Government (through the Atomic Energy Commission, the Energy Research and Development Administration, or the Department of Energy) for uranium enrichment services, and with General Electric Co. for fuel fabrication services for the nuclear fuel to be used at the Clinton Power Station. Prior to February 2, 1981, petitioner made prepayments on these contracts totaling approximately $34 million.

Petitioner typically maintains a capital structure of 45-percent debt, 12-percent preferred stock, and 43-percent common stock. Debt financing is the least expensive form of capital for utilities and common stock is the most expensive, because of the differing risks to investors.[2]

---

[2]In other words, because any return on common stock may only be paid after interest obligations on debt, the common stockholder has more risk than the debt holder, and consequently, requires a higher rate of return.

When raising additional funds petitioner attempted to maintain the above capital structure, as the issuance of debt without also issuing additional equity results in a decline in petitioner's credit rating, thus increasing the cost of borrowing. Petitioner initially financed the above prepayments for nuclear fuel under its normal capital structure, by using a mixture of debt and common and preferred stock. Subsequently, petitioner decided to explore other options for financing the nuclear fuel which would avoid putting pressure on its credit rating, and would also lower the financing cost of the fuel.

### The Sale-Leaseback

On the advice of its investment bankers, petitioner decided to finance the nuclear fuel supplied to the Clinton Power Station through the form of a sale-leaseback transaction, the terms of which are set forth below. In pursuit of this objective, on January 2, 1981, petitioner formed a corporation known as Illinois Power Fuel Co. (IPFC) with a capitalization of $100,000. On that same date, 100,000 shares of IPFC's stock were issued to petitioner. All of the officers and directors of IPFC are and always have been officers of petitioner. IPFC has no employees.

### (a) Approval by the FERC and the ICC

On November 7, 1980, petitioner filed with the FERC an "Application for Determination of Lack of Jurisdiction or Application for Authorization to Enter Into a Lease for Nuclear Fuel and a Cash Deficiency Agreement." In the application, petitioner represented, inter alia, that as part of the lease agreement petitioner would incorporate a subsidiary (i.e., IPFC) in which petitioner would retain a 50-percent equity interest with the remaining 50-percent to "be donated by the company to a tax exempt charitable institution or sold to an independent entity."

Petitioner also represented that it would sell nuclear fuel to IPFC, lease the fuel back from IPFC, and enter into a "Cash Deficiency Agreement." Under the Cash Deficiency Agreement (see infra), petitioner was obligated to make loans to IPFC at any time the obligations of IPFC which were due, exceeded the funds available to IPFC. Petitioner

was also obligated to maintain bank lines of credit to support its own and IPFC's commercial paper.

Petitioner contended in the application that the above-described transaction did not fall within the scope of section 204 of the Federal Power Act, 16 U.S.C. sec. 824c (1982), which requires FERC approval of transactions involving (1) the issuance of a security or (2) the assumption of an obligation or liability as a guarantor, endorser, surety, or otherwise, in respect of the security of another person. Petitioner claimed that it did not assume any obligation or liability as a guarantor, endorser, surety, or otherwise in respect of any security of IPFC.

In its opinion, the FERC first noted that under the terms of the Cash Deficiency Agreement, petitioner was absolutely bound to the repayment of securities (i.e., the commercial paper) of IPFC, in the event of a default by IPFC; and that therefore, the proposed transaction constituted the assumption of an obligation or liability in respect of a security within the purview of section 204 of the Federal Power Act. Nevertheless, the FERC found that the transaction was consistent with the provisions of section 204 of the Federal Power Act, and thus, on December 18, 1980, it entered an order authorizing petitioner to enter into the arrangement.

On October 15, 1980, petitioner filed with the ICC a petition seeking authority to make an investment in, to transfer certain assets to, and to enter into and perform certain agreements with, IPFC. In this petition, petitioner represented that it intended to enter essentially the same transaction as was previously described with reference to the FERC. On December 23, 1980, the transaction was approved by the ICC.

(b) *The Transfer of Stock by Petitioner to Millikin University.*

As is indicated above, both the FERC and ICC approved the formation of IPFC and donation of 50-percent of the IPFC stock to a charitable organization. On February 2, 1981, petitioner transferred 50,000 shares of IPFC's stock to Aston & Co., a nominee of Millikin University. Also on that date, petitioner and Millikin University executed a document entitled "Stock Transfer Restrictions and Stock Pur-

chase Agreement." This agreement prohibits Millikin University from transferring its stock without providing petitioner with written notice. It also provides, inter alia, that within 90 days of such notice, petitioner shall either: (1) Consent to the transfer; (2) designate a recipient for a gift of the shares proposed to be transferred; or (3) purchase the shares at book value. In the event of a deadlock in any action of the shareholders or of the board of directors of IPFC, or at the termination of the Lease Agreement (see *infra*), the agreement provides that petitioner may designate a recipient for a gift of or purchase any or all of the IPFC shares.

On its Form 1120, U.S. Corporation Income Tax Return for 1981, petitioner reported a charitable contribution deduction of $50,000 in connection with the transfer of the 50,000 shares of IPFC stock to Millikin University.[3] It also reported in the Affiliations Schedule attached to the return, that its ownership in IPFC decreased to 50 percent on February 2, 1981, and left blank the space provided for disclosing that equitable ownership of the stock differed from record ownership of the stock. In its annual report to the FERC for 1981, petitioner reported a miscellaneous income tax deduction for the "Donation of IP Fuel Company Stock" in the amount of $50,000. On Schedule H of its 1981 Corporate Income Tax Return (Form 1120) IPFC reported that it was 50-percent owned by Millikin University.

Millikin University has never been involved in the management or operation of IPFC, but instead it has always authorized petitioner to vote its shares. It has also received a dividend from IPFC during each of the years it has held the stock.

(c) *The Terms of the Sale-Leaseback*

On February 2, 1981, petitioner and IPFC executed documents entitled: (1) Bill of Sale to Illinois Power Fuel Co. (the Bill of Sale); (2) Nuclear Fuel Lease Agreement (the

---

[3]It appears that Millikin University is a sec. 501(c)(3), I.R.C. 1954, organization to which deductible donations may be made under the provisions of sec. 170, I.R.C. 1954; neither party contends otherwise.

Lease Agreement); and (3) Cash Deficiency Agreement (collectively referred to as the Nuclear Fuel Agreements).
The Bill of Sale provides, in part, that:

for and in consideration of the sum of $39,810,165.19 * * * the Vendor [petitioner] hereby conveys, transfers, sells, assigns and sets over all of the personal property consisting of the bundles of nuclear fuel, the components thereof, other nuclear material or interest therein and/or interests in contracts described in Exhibit I hereto (the "Nuclear Fuel"), and by this bill of sale does hereby grant, bargain, transfer, sell, assign and deliver the Nuclear Fuel unto the Purchaser [IPFC] to have and to hold the Nuclear Fuel unto itself, its successors and assigns, forever.

The $39,810,165.19 purchase price represents the amount at which petitioner carried the fuel on its books (payments on fuel contracts plus the accrual of interest during the construction of the project). The Bill of Sale also provides that IPFC was licensed to own, but not to possess the nuclear fuel, and that possession of the fuel would be with petitioner or a manufacturer. The document further provides that "under no circumstances shall a transfer of possession of the Nuclear Fuel to the Purchaser be necessary for the transfer of ownership effected and intended to be effected by this Bill of Sale."

Pursuant to the Lease Agreement, IPFC leased the nuclear fuel which was the subject of the Bill of Sale back to petitioner. Under the agreement, petitioner as lessee is obligated to make payments to IPFC as lessor, consisting of "Basic Rent" and "Additional Rent." Basic Rent is defined as "the sum of the Monthly Lease Charge, less the Capitalized Monthly Lease Charges, plus the Burn-up Charge for the preceding month." The Monthly Lease Charge is essentially all of the borrowing costs or other costs incurred by IPFC during a particular month.[4] The

---

[4] The Monthly Lease Charge is defined for any calendar month during the term of the lease as:

(i) an accrual for such month of all interest expense, and of the amortization of debt discount, whether or not paid, with respect to all indebtedness of Lessor for borrowed money which is outstanding at any time during such month; plus

(ii) an accrual for such month with respect to all commitment and other fees, costs and expenses (including depositary's or issuing agent's fees, Commercial Paper, support fees, dealer fees and debt placement fees) and similar expenses incurred by Lessor in connection with its borrowings of money; plus

(iii) an accrual for such month of a management charge composed of:

(a) The cost recovery for a prorata [sic] portion of all of Lessor's operating expenses (other than those, if any, included in preceding clauses (i) and (ii)) for the calendar year in which such

Capitalized Monthly Lease Charges are defined as "Monthly Lease Charges included in the Capitalized Cost of Nuclear Fuel." "Capitalized Cost" is in turn defined to include any portion of the Monthly Lease Charges for which petitioner has elected to defer payment.[5] The Burnup Charges are computed by first calculating the Net Investment Value[6] of the fuel, and then multiplying this amount by a fraction consisting of the number of units of heat consumed during a month over the total number of units of heat in the reactor.

Additional Rent is defined to include essentially any other administrative or interest expenses incurred by IPFC not paid as part of Basic Rent.

---

month occurs, as projected by Lessor and provided to and reviewed by Lessee before the beginning of such year (or before the beginning of the term of the Lease in the case of the calendar year in which such term begins), adjusted annually for the difference between Lessor's projected management charge and the amount of such expenses actually incurred for the preceding calendar year; plus

(b) An allowance equal to one-twelfth of that amount which produces the same annual rate of return on Lessor's total common equity at the beginning of such month (being, for this purpose, the total of the capital received by Lessor for its outstanding common stock plus any capital contributed to Lessor and allocable to such common stock) as the common equity rate of return which was used to determine the retail electric rates in effect for Lessee in the State of Illinois at the end of such month; and minus

(iv) Lessor's cash income for such month on investment of moneys received in connection with the transactions contemplated by the Lease or any Credit Agreement, other than moneys received pursuant to clause (iii) above. Any figure used in the computation of any component of the Monthly Lease Charge shall be stated with sufficient accuracy to enable calculation of the Monthly Lease Charge to the nearest dollar. No accrual, charge or other item which would constitute a part of the Acquisition Cost shall be included in the computation of Monthly Lease Charges.

[5]The Lease Agreement provides:

"Capitalized Cost means the sum of * * * (iii) if and to the extent that Lessee elected to capitalize any such Monthly Lease Charges, Monthly Lease Charges accrued pursuant to the Lease which, in Lessee's sole judgment, are allocable to such Nuclear Fuel (a) during any stage of its Nuclear Fuel Cycle other than Heat Production or (b) during the period beginning on the Termination Notice Date and ending on the Termination Settlement Date; provided, however, that Monthly Lease Charges may be allocated to and included in Capitalized Cost by Lessee in an amount not exceeding the sum of (x) the amount of credit then immediately available to Lessor under any Credit Agreement plus (y) any cash available to Lessor for the purpose of paying such Capitalized Monthly Lease Charges in any account under any Credit Agreement."

[6]The Net Investment Value (N.I.V.) of the fuel is equal to "the excess of the amount of the Investment in such [fuel] over the aggregate amount of Burn-up Charges theretofore paid by Lessee to Lessor ." The accrued liability for the Monthly Lease Charge becomes part of the N.I.V. through the definition of "Investment" which includes all Capitalized Costs:

"Investment" means with respect to any portion of the Nuclear Fuel, the sum of (i) the Acquisition Cost for such portion, plus (ii) the Capitalized Cost for such portion, which has been paid or accrued by the Lessor, including payments by Lessor to Lessee.

When current payment of the Monthly Lease Charge is deferred by treating such payments as Monthly Lease Charges, such amounts become part of Capitalized Costs. Thus, any liabilities for interest under the Monthly Lease Charge for which petitioner has elected to defer payment become part of the N.I.V. used in computing the Burnup Charge.

The Lease Agreement terminates on December 31, 2021, unless either party elects with 12-months notice to terminate the lease on an earlier date. The expected life of the nuclear fuel is approximately 3 to 4 years.

Once the nuclear fuel is loaded into the reactor it cannot be used elsewhere and will be converted into nuclear waste that has no residual value. The spent fuel must then be disposed of to avoid contamination. To insure that petitioner is responsible for the cost of this disposition, title to the nuclear fuel reverts to petitioner upon the earlier of removal of the nuclear fuel from the reactor or termination of the Lease Agreement. Petitioner is not required to make any payments to regain title unless payments during the term of the Lease Agreement have been insufficient to cover all of IPFC's obligations.

As IPFC had a capitalization of only $100,000, it had to issue commercial paper to obtain funds necessary to acquire the nuclear fuel. Although the commercial paper is issued solely in the name of IPFC, to ensure that purchasers of IPFC commercial paper would be repaid, IPFC and petitioner executed the Cash Deficiency Agreement. The agreement defines "cash deficiency" as:

With respect to any Due Date, the amount by which the aggregate of the Indebtedness of [IPFC], due and payable on such Due Date, exceeds the amount of money then available to [IPFC] for payment thereof.

"Due Date" is defined as:

Any date on which any Indebtedness of [IPFC] is due and payable, provided that in the case of Indebtedness which by contractual or statutory provisions is due and payable within a period of time, the Due Date for such Indebtedness shall be the last day on which such payment may be made without violating the contractually or statutorily prescribed time limit for payment and without incurring any additional charge (however denominated) or other penalty on account of late payment.

The agreement further provides:

Section 2. *Borrowings to pay cash deficiencies.*
(a) *Borrowing*
If for any reason whatsoever [IPFC] has a Cash Deficiency on any Due Date. [Petitioner], upon demand by [IPFC], shall forthwith pay to [IPFC] in lawful money of the United States of America, an amount equal to such Cash Deficiency. Each amount so paid by [petitioner] shall constitute a borrowing from [petitioner] by [IPFC], bearing interest at the

rate determined in accordance with Exhibit A to this Agreement. The principal amount of each such borrowing, together with the interest accrued thereon, shall be due and payable to the order of [petitioner] at [petitioner's] principal place of business or at such other place as may have been specified in a notice given by [petitioner] to [IPFC], on or before the ninetieth day after the date the particular borrowing was made. The Indebtedness of [IPFC] on account of its borrowings pursuant to this Section shall be subject to the subordination provisions in Section 5 hereof and is herein sometimes called "Subordinated Debt."

\* \* \* \* \* \* \*

Section 3. *[Petitioner] to Maintain Lines of Credit.*
During the term of this Agreement, [petitioner] shall maintain unused lines of credit with lending institutions under which [petitioner] shall be entitled to borrow sums of money in an aggregate amount equal to the total of (a) the aggregate principal amount of the Commercial Paper of [IPFC] then outstanding (b) plus the aggregate principal amount of Commercial Paper of [petitioner] then outstanding.

## With respect to the nature of the obligations of petitioner, the agreement provides:

Obligations of [petitioner] under Section 2 hereof shall remain in full effect during the term of this Agreement and shall not be dependent upon any covenant, performance or other event, other than expressly set forth herein (being the expressed requirements of the existence of a Cash Deficiency and of a demand upon [petitioner] for payment. Except for the right to require the foregoing express requirements to be satisfied, [petitioner] waives any and all other defenses to its obligations under Section 2 herein, including, without limitation, any right of set-off, recoupment, deduction, abatement, suspension, deferment, reduction or other defense or right which [petitioner] may have on account of (a) any claim against [IPFC] or any party to whom any Indebtedness of [IPFC] is owed, whether rising under this Agreement, the Fuel Lease, any other agreement relating to the financing or use of nuclear fuel for the Clinton Plant, or otherwise \* \* \*

## As to third parties the agreement provides:

Section 7. *Third Party Beneficiaries.*
The provisions of this Agreement are intended to benefit all holders of Commercial Paper of [IPFC] and any such holder shall be entitled to enforce the provisions of this agreement in its own name.

To satisfy its obligations under the Cash Deficiency Agreement, petitioner obtained a $125,000,000 line of credit from a group of U.S. and foreign banks.

After February 2, 1981, petitioner has been required to make additional payments for nuclear fuel under its con-

tracts with Kerr-McGee, the Department of Energy, and General Electric. In each case, the contractors billed petitioner.[7] Petitioner then invoiced IPFC who sold additional commercial paper and remitted the proceeds to petitioner. As a result of such payments, IPFC's outstanding commercial paper as of the end of 1981 was approximately $57,000,000.

In its 1981 annual report to the ICC, petitioner reported:

During February, 1981 the Company sold [its] investment of approximately $40 million in nuclear fuel to Illinois Power Fuel Company from which the Company will lease most of [its] nuclear fuel when Clinton Unit 1 becomes operational.

In its 1982 annual report to the FERC, petitioner likewise reported that a $39,810,165 reduction in nuclear fuel materials "represents the Sale to IP Fuel Company." In its 1981 annual report to its shareholders, petitioner reported under the heading "Financings" that "We sold our investment of $39.8 million in Nuclear Fuel in February, 1981 to Illinois Power Fuel Company, an affiliate formed to finance a part of the fuel for Clinton power station Unit 1. We own 50 percent of the fuel company, from which we will lease most of our nuclear fuel." Each of these annual reports also contain the following statement:

Illinois Power Fuel Company, which is 50 percent owned by the Company, was formed in January, 1981 for the purpose of financing a portion of the nuclear fuel requirements of the Clinton power station. The Company entered into a lease agreement with the Fuel Company under which the Company will lease nuclear fuel. Lease payments, which will be equal to the Fuel Company's cost of fuel as consumed, will begin when the Clinton power station commences pre-commercial operation. The Company is obligated to make subordinated loans to the Fuel Company at any time the obligations of the Fuel Company which are due and payable exceed the funds available to the Fuel Company. The Company's investment of $50,000 is accounted for under the equity method and the lease is accounted for as an operating lease in accordance with an Illinois Commerce Commission order.

In its 1981 income tax return, IPFC indicated:

[7]Despite the existence of the Bill of Sale, the contracts for nuclear fuel with Kerr-McGee, the Department of Energy, and General Electric were never amended to substitute IPFC for petitioner, and petitioner continued to deal with those contractors as the owner of the fuel.

In February of 1981, Illinois Power Company (Fed. ID #37-0344645) entered into a sale and leaseback transaction with Illinois Power Fuel Company to effect a financing arrangement for its nuclear fuel being processed for Illinois Power Company's Clinton Plant which is presently under construction.

Under the published guidelines of the Internal Revenue Service in Revenue Ruling 55-540, 1955-2 C.B. 39, Revenue Procedure 75-21, 1975-1 C.B. 715 and other related revenue rulings and procedures, Illinois Power Company continues to be treated as the owner of the Nuclear Fuel after the "sale-lease" transaction because it retains the full incidents and burdens of ownership regardless of the fact that mere legal title is now held by Illinois Power Fuel Company.

Since Illinois Power Company continues to be treated as the owner of the nuclear fuel for tax purposes, the assets involved and related debt are reflected in the tax records of Illinois Power Company along with related items of income and expense.

Respondent determined that as a result of the sale-leaseback transaction, petitioner incurred a $5,604,253 capital gain.[8]

## The Lease Charge Deduction

Petitioner could choose to defer payment of any current portion of the lease charges due under the Lease Agreement. Petitioner had elected to defer $6,065,588 in this manner in 1981, but, nevertheless, remained liable for this amount as of December 31, 1981. On its Form 1120 for the calendar year 1981, petitioner claimed an interest expense deduction in the amount of $6,065,528 as a result of its lease payments to IPFC. In his notice of deficiency, respondent disallowed in full this claimed deduction in its entirety.[9]

In its 1980 annual report petitioner announced that it expected to load fuel into the Clinton Power Station in

---

[8]The computation is described at note 18 infra.

[9]Petitioner conceded that $131,395 of the claimed amount was not deductible for the 1981 calendar year on the ground that such amount was not part of the Monthly Lease Charge required by the Lease Agreement. The remaining $5,934,133 of the claimed deduction is still in dispute, computed as follows:

Interest expense - commercial paper

| | |
|---|---|
| (Morgan Guaranty Trust Co.) | $5,925,495 |
| Amortization - lease finance costs | 2,993 |
| organizational expenses | 0 |
| Appraisal service - Moody's Investor Service | 5,495 |
| Franchise tax | 150 |
| Total | 5,934,133 |

January 1983. In its 1982 annual report, petitioner acknowledged that commercial operation of the plant would be delayed past August 1984. At the time of trial, the plant was 97-percent complete.

## The Alleged Interest Income

On February 2, 1981, simultaneously with the execution of the Bill of Sale, IPFC's vice president and treasurer, on behalf of IPFC, executed a document entitled "Demand Note Number 1" promising to pay to the order of petitioner $39,810,165.19, plus interest. IPFC made payments on the demand note to petitioner cast in the following form:

| Date | Principal | Interest | Total |
|------|-----------|----------|-------|
| Mar. 9, 1981 | $8,000,000.00 | $77,777.78 | $8,077,777.78 |
| Mar. 10, 1981 | 17,000,000.00 | 170,000.00 | 17,170,000.00 |
| Mar. 11, 1981 | 14,810,165.19 | 152,215.59 | 14,962,380.78 |
| Total | 39,810,165.19 | 399,993.37 | 40,210,158.56 |

For the year ended December 31, 1981, IPFC recorded on its financial records payments of interest to petitioner in the amount of $399,993.37. For that same year, petitioner recorded on its financial records receipt of interest payments from IPFC in the amount of $399,993. This amount was not treated as interest income on petitioner's 1981 tax return, but was treated as such in respondent's notice of deficiency.

### OPINION

## I. *Preliminary Issues*

Preliminary to our discussion of what we consider to be the primary issues in this case (i.e., whether petitioner's transfer of stock to Millikin University should be disregarded so that IPFC is considered a member of its "affiliated group" for purposes of petitioner's consolidated return, and whether the transfer of nuclear fuel by petitioner which was cast as a sale-leaseback was in reality a financing arrangement for Federal tax purposes), it is important to consider the context in which these questions arise. In the first instance, petitioner is seeking to disavow the form of a transaction structured as a gift, and in the second, peti-

tioner is seeking to disavow the form of a transaction structured as a sale-leaseback. It is significant that in each case, it is the taxpayer and not the Government which seeks to disavow the form of a transaction. As we observed in *Bolger v. Commissioner*, 59 T.C. 760, 767 n. 4 (1973): "the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted." (Citations omitted.) See also *Bradley v. United States*, 730 F.2d 718, 720 (11th Cir. 1984); *Spector v. Commissioner*, 641 F.2d 376, 381 (5th Cir. 1981), revg. and remanding 71 T.C. 1017 (1979); *Coleman v. Commissioner*, 87 T.C. 178, 201-202 (1986).

Any appeal in the instant case lies to the Court of Appeals for the Seventh Circuit and thus we must look to that court's interpretation of the law in this area. *Golsen v. Commissioner*, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). In this respect, the Seventh Circuit has indicated:

> Resort to substance is not a right reserved for the Commissioner's exclusive benefit, to use or not to use—depending on the amount of the tax to be realized. The taxpayer too has a right to assert the priority of substance—*at least in a case where his tax reporting and actions show an honest and consistent respect for the substance of a transaction.* [*Comdisco, Inc. v. United States*, 756 F.2d 569, 578 (7th Cir. 1985) (emphasis added) (quoting *Weinert's Estate v. Commissioner*, 294 F.2d 750, 755 (5th Cir. 1961)).]

Here, we are presented with a seemingly disharmonious fact pattern in that, in light of the principles set forth in *Comdisco*, we are convinced that petitioner may attack the form of the sale-leaseback transaction but may not do so with respect to the purported gift. As is more fully discussed below, we reach this seemingly inconsistent result because petitioner's tax reporting and other actions showed an honest and consistent respect for the substance of the nominal "sale-leaseback," but they do not show the same sincerity for the alleged gift.

### The Transfer to Millikin University

Petitioner argues that the transfer of 50 percent of IPFC's stock to Millikin University, which was cast in the form of a gift, should be disregarded because beneficial ownership of

the stock remained with petitioner as a result of the Stock Restrictions and Stock Transfer Agreement. Hence, argues petitioner, if the gift is disregarded, IPFC becomes a wholly owned subsidiary, and pursuant to sections 1.1502-11 and 1.1502-13, Income Tax Regs., any interest income or gain from the sale-leaseback is not required to be currently reported.

We are of the opinion that in this instance, petitioner may not disavow the form of the gift transaction. The transaction has been consistently characterized by petitioner as a gift. In its petitions to the FERC and ICC for approval of the Nuclear Fuel Agreements, petitioner represented that it would incorporate a subsidiary (i.e., IPFC) and that 50 percent of the subsidiary's stock would be *"donated by the company to a tax exempt organization* or sold to an independent entity."* (Emphasis added.) It was with this understanding that the FERC and ICC approved the transaction on December 18, 1980, and December 23, 1980, respectively. On February 2, 1981, petitioner transferred 50 percent of IPFC's stock to Aston & Co., a nominee of Millikin University. For its corporate income tax return for the tax year December 31, 1981, petitioner reported a charitable contribution deduction of $50,000 from the transfer of IPFC stock to Millikin University. It also reported in the Affiliations Schedule attached to the return, that its ownership in IPFC decreased to 50 percent on February 2, 1981, and left blank the space provided for disclosing that equitable ownership of the IPFC stock differed from record ownership of the stock—directly contrary to the position it is now taking. In its 1981 annual report to the FERC, petitioner likewise reported a miscellaneous income tax deduction for the "Donation of IP Fuel Company Stock." Even IPFC, on Schedule H of its 1981 corporate income tax return, reported that it was 50-percent owned by Millikin University.

These facts clearly show that for tax reporting and other purposes, petitioner consistently treated the transfer as a gift. To now allow petitioner to attack the form of a transaction that it structured and respected would run afoul of the principles established in *Comdisco*. It would also create uncertainty in that taxpayers at their whim could

choose to respect or not respect transactions depending on which approach would most favor their position at trial. As was stated by this Court in *Groetzinger v. Commissioner*, 87 T.C. 533, 542 (1986):

In applying the substance-over-form doctrine we are concerned with the intentions *at the time of the agreement* and economic realities *as then perceived by the participants*. [Emphasis added.]

See *Wager v. Commissioner*, 52 T.C. 416, 419 (1969).[10] In the instant case, at the time the stock was transferred by petitioner to Millikin University, the actions of petitioner and IPFC clearly show that they perceived the transfer to be a gift. We are not concerned with petitioner's hindsight perspective of the transaction's potential tax benefits. Accordingly, we conclude that the form of the transfer will not be disregarded and that petitioner may not treat IPFC as a member of its affiliated group for the 1981 tax year.[11]

## The Sale-Leaseback Transaction

We are compelled to reach a different result, however, with respect to the sale-leaseback transaction. The transaction was labeled a "sale-leaseback" by petitioner, but it was consistently treated as a financing for tax reporting and other purposes. Although petitioner reported in its annual reports to the ICC, the FERC, and to its shareholders, that it sold approximately $40 million in nuclear fuel to IPFC,[12] each of these reports also contained the following statement:

Illinois Power Fuel Company, which is 50 percent owned by the Company, was formed in January, 1981 *for the purpose of financing* a portion of the nuclear fuel requirements of the Clinton Power Station. The Company entered into a lease agreement with the Fuel Company, under which the Company will lease nuclear fuel. Lease payments, which

---

[10]See also *Emmer v. Commissioner*, T.C. Memo. 1978-102.

[11]This is not to say that the Commissioner is prevented from attacking whatever label the taxpayer attaches to a transaction. See *Gregory v. Helvering*, 293 U.S. 465 (1935). But where the taxpayer has consistently reported a transaction in one manner, then (at least in cases appealable to the Seventh Circuit) he may not be permitted to later claim that the substance of the transaction was something different.

[12]We are mindful that the characterization of a transaction for financial accounting purposes, on the one hand, and tax return purposes on the other, need not necessarily be the same. *Frank Lyon Co. v. United States*, 435 U.S. 561, 597 (1978) (citing *Commissioner v. Lincoln Savings & Loan Association*, 403 U.S. 345, 355 (1971), and *Old Colony R. Co. v. Commissioner*, 284 U.S. 552, 562 (1932)).

will be equal to the Fuel Company's cost of fuel as consumed, will begin when the Clinton Power Station commences pre-commercial operation. The Company is obligated to make subordinated loans to the Fuel Company at any time the obligations of the Fuel Company which are due and payable exceed the funds available to the Fuel Company. [Emphasis added.]

More importantly, for tax reporting purposes, consistent with its treatment of the arrangement as a financing, petitioner claimed an interest expense deduction of $6,065,528 for the transaction, rather than a gain on the sale of nuclear fuel. Further, the following statement was contained in IPFC's Corporate Income Tax Return (Form 1120) for the 1981 tax year:

> In February of 1981, Illinois Power Company (Fed. ID #37-0344645) entered into a sale and leaseback transaction with Illinois Power Fuel Company to effect a financing arrangement for its nuclear fuel being processed for Illinois Power Company's Clinton Plant which is presently under construction.
>
> Under the published guidelines of the Internal Revenue Service in Revenue Ruling 55-540, 1955-2 C.B. 39, Revenue Procedure 75-21, 1975-1 C.B. 715 and other related revenue rulings and procedures, Illinois Power Company continues to be treated as the owner of the Nuclear Fuel after the "sale-lease" transaction because it retains the full incidents and burdens of ownership regardless of the fact that mere legal title is now held by Illinois Power Fuel Company.
>
> Since Illinois Power Company continues to be treated as the owner of the nuclear fuel for tax purposes, the assets involved and related debt are reflected in the tax records of Illinois Power Company along with related items of income and expense.

The combination of these facts persuades us that petitioner's tax reporting actions have shown an honest and consistent respect for what it considers to be the substance of the Nuclear Fuel Agreements. Its intentions were made clear at the time the agreements were entered into and have continued to be manifested in a similar manner. Thus, under *Comdisco v. United States, supra,* petitioner is not bound to the labels affixed to the transaction, but instead may argue that the economic substance of the arrangement is controlling for Federal tax purposes.[13]

---

[13]No evidence has been offered as to the existence of actual or potential "conflicting claims" in this case which was a subject for concern for the Seventh Circuit in *Comdisco.* See *Comdisco v. United States,* 756 F.2d 569, 578 (7th Cir. 1985).

Having decided that petitioner may attempt to disavow the form of the Nuclear Fuel Agreements we must next determine the standard of proof to be applied. Here there is no question that title to the nuclear fuel passed from petitioner to IPFC pursuant to the Bill of Sale.[14] Yet petitioner steadfastly maintains that it, rather than IPFC, was the owner of the nuclear fuel for Federal tax purposes. In such a situation, we have held that because title did vest with someone other than the taxpayer, respondent has made a prima facie case that a sale, rather than a financing, occurred. *Coleman v. Commissioner*, 87 T.C. 178, 204 (1986). As was indicated in *Coleman*, this does not mean that petitioner was not the owner of the nuclear fuel, but that petitioner has the burden of producing, at a minimum, "strong proof"[15] that the other elements of the burdens and benefits of ownership were such that petitioner should be considered the owner of the fuel. 87 T.C. at 204.[16] See *Ullman v. Commissioner*, 264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957); *Schulz v. Commissioner*, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); *Major v. Commissioner*, 76 T.C. 239, 247 (1981); *Lucas v. Commis-*

---

[14]As is indicated in our findings, the Bill of Sale provides that petitioner "conveys, transfers, sells, assigns and sets over" the nuclear fuel to IPFC. The Lease Agreement similarly provides that:

"Title to and ownership of the Nuclear Fuel shall at all times remain in Lessor [IPFC] and at no time become vested in Lessee [petitioner] except in accordance with an expressed provision of this Lease. This is a lease only, and shall not give or grant to Lessee any right, title or interest in or to the Nuclear Fuel, or any portion thereof, except the rights of a tenant in accordance with the provisions hereof."

[15]A precise definition of "strong proof" has not been articulated. Suffice it to say that the strong proof standard requires a showing of somewhat more than a preponderance of the evidence and somewhat less than the so-called "Danielson test" under which a party can challenge the form of an agreement "only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967). See *Elrod v. Commissioner*, 87 T.C. 1046 (1986) (strong proof requires "more than a preponderance of the evidence"); *Emmer v. Commissioner, supra*; cf. *Schulz v. Commissioner*, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); *Balthrope v. Commissioner*, 356 F.2d 28 (5th Cir. 1966), affg. a Memorandum Opinion of this Court; *Hamlin's Trust v. Commissioner*, 209 F.2d 761 (10th Cir. 1954), affg. 19 T.C. 718 (1953).

The Seventh Circuit, to which an appeal in this case would lie, has apparently indicated its acceptance of the strong proof standard. See *Kreider v. Commissioner*, 762 F.2d 580, 586-587 (7th Cir. 1985), affg. a Memorandum Opinion of this Court.

[16]The Government once again urges us to reject the "strong proof" standard in favor of the stricter standard of *Danielson v. Commissioner, supra*. We again refuse to reconsider this matter. See *Lucas v. Commissioner*, 58 T.C. 1022, 1032 n. 1 (1972); *Mittleman v. Commissioner*, 56 T.C. 171, 175 (1971), affd. 464 F.2d 1393 (3d Cir. 1972); *O'Callaghan v. Commissioner*, T.C. Memo. 1984-214.

*sioner*, 58 T.C. 1022, 1032 (1972).[17] It is these other elements of the benefits and burdens of ownership to which we now turn our attention.

## II. *The Sale-Leaseback*

Petitioner argues that it clearly possessed the benefits and burdens of ownership of the nuclear fuel and that the transaction should therefore be viewed as a financing for Federal tax purposes. Respondent takes the position that the substance of the arrangement was a sale-leaseback, and that petitioner must therefore recognize a $5,604,253 capital gain on the sale of the fuel.

A review of the entire record in this case convinces us that petitioner has presented strong proof that it retained the benefits and burdens of ownership of the nuclear fuel, with the result that we will treat the transaction as a financing rather than a sale. In reaching this result, we find the following factors to be particularly persuasive:

### (1) *The Terms of Payment*

The payment terms of the transaction reflect a financing rather than a bona fide arm's-length sale. The "purchase price" paid by IPFC for the nuclear fuel, represented the value of the fuel as shown in petitioner's books, or petitioner's total investment in the fuel.[18] No effort was

---

[17]It is clear that the "strong proof" rule applies beyond the confines of allocating payments to a covenant not to compete. See *Coleman v. Commissioner*, 87 T.C. 178 (1986) (was transaction a valid sale-leaseback); *Miami Purchasing Service Corp. v. Commissioner*, 76 T.C. 818, 830 (1981) (where did title pass from taxpayer to buyer); *Stephens v. Commissioner*, 60 T.C. 1004 (1973), affd. without opinion 506 F.2d 1400 (6th Cir. 1974) (whether taxpayers were legally obligated to buy stock).

Our suggestion in *Rochester Development Corp. v. Commissioner*, T.C. Memo. 1977-307, that neither the *Danielson* rule nor the "strong proof" rule applied in determining whether a transaction involved a sale or lease was made in the context of a decision which did "not involve an attempt by petitioner to vary the undertakings set forth in the written agreements." See *Coleman v. Commissioner, supra* at 202 n. 18.

[18]The Bill of Sale describes the purchase price for the nuclear fuel as follows:

| | |
|---|---|
| Natural UF6 299,840 kilograms | $28,882,648.83 |
| Prepaid enrichment services to be applied to 157,423 kilogram units of separative work | 5,263,199.96 |
| Prepaid enrichment services to be applied to 71,936 kilogram units of separative work | 5,664,316.40 |
| Total | 39,810,165.19 |

made by petitioner to sell the fuel at its fair market value and, in fact, as Larry D. Haab, petitioner's senior vice president and chief financial officer, testified at trial,[19] the market value of the fuel may have been actually lower than the book value on the date of the sale.

As is indicated in our findings, petitioner entered contracts with Kerr-McGee Nuclear Corp. for the purchase of raw uranium, with the Department of Energy for uranium enrichment services, and with General Electric Co. for fuel fabrication services. After title to the nuclear fuel had passed to IPFC, payments pursuant to the above contracts were made in the following manner: When a payment became due, petitioner invoiced IPFC who, in turn, sold commercial paper to raise the necessary funds. The cash proceeds from the sale of the commercial paper were then turned over to petitioner, who used the money for the contract payments. By the end of 1981, IPFC had issued approximately $57 million of commercial paper, the proceeds of which were used to finance payments for the nuclear fuel.

The lease payments were structured simply to repay IPFC for the costs incurred by IPFC in financing the payments for the nuclear fuel to the three contractors mentioned above. As is set out in more detail in our findings, under the terms of the Lease Agreement petitioner is required to pay IPFC a sufficient amount to cover: (1) All of IPFC's costs to issue and pay interest on the outstanding commercial paper; (2) any administrative costs incurred by IPFC; and (3) the amounts initially paid by IPFC under the Bill of Sale to acquire the nuclear fuel. The Lease Agreement also provides for a stated return on IPFC's $100,000 equity—the same rate of return permitted by the State of Illinois to petitioner in structuring its utility rates. These payment terms clearly show that the lease was structured to enable petitioner to

---

The parties have stipulated that the adjusted basis of the fuel for tax purposes is $34,205,912.99. The difference between $39,810,165.19 and $34,205,912.99 is $5,604,252.10—the amount claimed by respondent to be the capital gain on the transfer of the fuel.

The book value of the fuel is claimed by petitioner to be $39,810,165.19. Although the difference between the book value and the adjusted tax basis for the fuel was not explained at trial, it apparently results from interest expenses and other expenses which were capitalized for regulatory books of account but which were currently expensed for tax purposes.

[19]Throughout trial, we found Mr. Haab's testimony to be forthright, impressive, and entirely believable.

finance its original acquisition costs for the fuel instead of to provide IPFC with a reasonable return for the use of the fuel. In this regard, Mr. Haab testified that petitioner was only concerned with covering IPFC's expenses and having IPFC show a slight profit, but that no consideration was given by petitioner as to the fair rental value of the fuel. Thus, we are convinced that the purchase price and lease payments were structured in the manner of a financing—they reflect the costs of financing the fuel—not an arm's-length bargaining process.

### (2) *The Potential for Profit or Loss*

A significant factor to be used in determining ownership of property is the extent to which the taxpayer has potential for profit or loss as a result of holding the property. See *Frank Lyon Co. v. United States*, 435 U.S. 561, 579 (1978); *Sun Oil Co. v. Commissioner*, 562 F.2d 258, 268 (3d Cir. 1977); *Hilton v. Commissioner*, 74 T.C. 305, 350-361 (1980), affd. 671 F.2d 316 (9th Cir. 1982).

In this case, the transaction was structured so that profits and losses resulting from the use of the fuel will inure to petitioner. The nuclear fuel has an estimated useful life of only 3 to 4 years, and as will be shown, the use rights associated with the fuel during this time period remain exclusively with petitioner.

The Bill of Sale provides that, notwithstanding the sale of the nuclear fuel to IPFC, possession of the fuel shall remain with petitioner or a manufacturer. In fact, on the date the Bill of Sale was entered into, IPFC's license permitted it to own the fuel, but it did not permit it to possess the fuel. The Lease Agreement similarly provides that possession of the fuel shall remain with petitioner throughout the term of the lease, which continues through December 31, 2021. The lease further and more importantly provides that petitioner "shall have exclusive possession and use of the Nuclear Fuel." The effect of these lease terms is that petitioner, not IPFC, has the exclusive right to use the fuel throughout its useful life. As petitioner owns the right to use the fuel, profits or losses resulting from the use of the fuel to generate power will inure to petitioner.

IPFC, on the other hand, has a fixed rate of return. The lease payments to IPFC consist of Basic Rent (i.e., the costs of issuing and interest expenses paid on the commercial paper issued by IPFC to finance the acquisition costs of the fuel), Additional Rent (i.e., any administrative or other operating expenses incurred by IPFC), and Burnup Charges (i.e., return of the purchase price originally charged to IPFC for the fuel—to be paid as the Clinton Power Station becomes operational). IPFC was also entitled to the same rate of return on its $100,000 common equity as was used to determine the retail electric rates then in effect for petitioner.[20] Mr. Haab testified that the reasoning behind paying IPFC a return on its equity was merely to enable it to show a nominal profit.

The structuring of the Lease Agreement makes it clear that IPFC had no equity interest in the transaction. The potential profit or risk of loss from using the fuel remained with petitioner.[21] IPFC, with its nominal return, was merely an entity used by petitioner for financing purposes. As was made clear at trial, the reasons behind structuring the transaction in such a manner were threefold: (1) To reduce the overall financing costs of the fuel—this would be achieved as the initial investment in IPFC was nominal ($100,000) and the remaining investment in the fuel (expected to exceed $100 million) could be financed by IPFC at lower rates than would be available to petitioner if it attempted to issue more debt or preferred stock; (2) to enable petitioner to maintain its double A credit ratings on its outstanding debt and preferred stock with the result of leveling its financing costs on these obligations; and (3) to conserve petitioner's bondable additions. The ultimate result of the lower financing costs would be to cause utility rates paid by consumers to be lower than they would otherwise be.

In short, by creating IPFC, petitioner did not create an equity participant with real profit or loss opportunities. It instead simply created a vehicle that could be used by petitioner to achieve lower financing costs.

---

[20]At the time of trial the rate being used was 15 percent.

[21]Mr. Haab also testified that the transaction was structured so that IPFC could neither benefit nor suffer from an increase or decrease in the value of the nuclear fuel.

(3) *The Other Benefits and Burdens Retained by Petitioner*

In addition to its right to exclusive use of the fuel, the Lease Agreement bestowed other valuable rights on petitioner. Certain of these bear mentioning. For example, under the terms of the lease, petitioner is designated as the lawful representative of IPFC in all dealings with manufacturers and any regulatory agency having jurisdiction over the ownership or possession of the nuclear fuel. Petitioner is also granted the right to engage in "Fuel Management," which is defined in the lease as "the design of, contracting for, determining the price and terms of acquisition of, management, movement, removal, disengagement, use, storage and other activities in connection with the utilization of the Nuclear Fuel ." In addition, petitioner has the right to move any portion of the fuel to specified locations for storage or servicing. The terms of the lease further provide that to the extent the nuclear fuel is eligible for the job incentive credit, investment tax credit, or service credit, it will be treated as having been acquired by petitioner for that taxable year.

Perhaps petitioner's most significant right is the right to purchase all or any portion of the nuclear fuel from IPFC at any time throughout the term of the lease, regardless of the fair market value of the fuel. To make such a reacquisition, petitioner is merely required to pay IPFC the original amount advanced to it by IPFC plus all of the accrued lease charges.[22]

The Lease Agreement also imposes significant burdens on petitioner. Petitioner is required to pay all taxes and other governmental charges assessed upon IPFC's interest in the nuclear fuel (other than Federal, State, or local income; excess profits; or franchise taxes arising from moneys payable or net income from the Lease Agreement) as well as all of the maintenance and repair expenses necessary to keep the nuclear fuel in good condition.[23] Petitioner is

---

[22]More specifically, as is indicated in detail in our findings, petitioner is required to reimburse IPFC the Net Investment Value of the fuel which is essentially the original acquisition cost paid by IPFC as well as any interest and administrative costs owed to IPFC which petitioner was elected to defer. See *supra* note 6.

[23]Under certain limited circumstances, petitioner may request reimbursement of some of these expenses.

likewise required, at its expense, to procure and maintain all permits and licenses required for ownership or operation of the nuclear fuel.

Insurance is a major concern of utility companies utilizing nuclear fuel. Here, the Lease Agreement requires petitioner to obtain, without cost to IPFC: (1) Nuclear liability insurance in the maximum amount available from the Nuclear Energy Liability Insurance Association or the Mutual Atomic Energy Liability Underwriters, or both; (2) physical damage insurance for damage arising from nuclear or non-nuclear occurrence in the amount usually maintained by investor-owned utilities operating like properties; and (3) liability insurance in an amount not less than $10 million for non-nuclear liability occurrences with respect to the nuclear fuel. The Lease Agreement also requires petitioner to indemnify IPFC, or any institutional lender that loans money to IPFC, for a wide variety of claims including any injury or death of persons, or physical damage, resulting from any nuclear incident connected with the nuclear fuel.

Nuclear fuel gradually turns into nuclear waste as it is burned in the reactor. Spent fuel must either be reprocessed and separated into recovered forms of radioactive materials, or processed into a form suitable for storage. Under the terms of the lease, petitioner, at its option, must either elect to reprocess the fuel, or elect to purchase the fuel in its spent state. In the event that petitioner elects to purchase the spent fuel, it is still required to pay the net investment value[24] of the fuel to IPFC. As Mr. Haab testified at trial, this payment has no relation to fair market value since, at this stage, the spent fuel actually has a negative value as a result of the significant disposal and storage costs then required to be paid by petitioner.

### (4) *The View of the Transaction by Third Parties*

As is indicated in our findings, petitioner, not IFPC, entered into all of the contracts for the acquisition of the nuclear fuel with three contractors: Kerr-McGee Nuclear Corp., the Department of Energy, and General Electric Co. Each of these continued to bill petitioner for the fuel even after title to the fuel was transferred to IPFC. Moreover,

---

[24]See definition *supra* at note 6.

when it became necessary to amend the contracts, after title to the fuel had passed, it was petitioner, and not IPFC, who executed the amendments.

The moneys used for payments under the above contracts were derived from the issuance. of commercial paper by IPFC. The cash proceeds from the sale of the commercial paper were turned over to petitioner, who in turn used the money for the contract payments. Again, petitioner, not IPFC, actually paid the contractors.

It is significant that credit support for the commercial paper was provided by petitioner. The Cash Deficiency Agreement, executed in conjunction with the other Nuclear Fuel Agreements, expressly requires petitioner to maintain unused lines of credit with lending institutions equal to the aggregate principal amount of the outstanding IPFC commercial paper. This condition was in fact complied with by petitioner, in that it obtained a $125 million line of credit from a group of United States and foreign banks. Under the terms of the Cash Deficiency Agreement the line of credit could be utilized by IPFC whenever its aggregate amount of indebtedness then due exceeded its available funds. It is also significant that the Cash Deficiency Agreement contains a section entitled "Third Party Beneficiaries" wherein it is indicated that the provisions of the agreement are intended to benefit all holders of commercial paper of IPFC and that any holder is entitled to enforce the provisions of the agreement in its own name. The Cash Deficiency Agreement additionally required petitioner to waive any defenses it may have to its obligations under the agreement, including any right of setoff, recoupment, suspension, deferment, or other defense petitioner may have as a result of the insolvency of IPFC.

Thus, it is apparent that petitioner retained substantial risks to third parties as to payment of the original acquisition costs of the nuclear fuel, even after petitioner transferred title to the fuel to IPFC.

In conclusion, we note that some of the provisions of the Nuclear Fuel Agreements, when viewed independently, may not brand the transaction as a financing arrangement. On the whole, however, we are convinced that petitioner has presented strong proof that "when the various agreements

are probed beneath their labels and are considered in the context of the surrounding facts and circumstances, it strains credulity and offends logic to find that a true sale, to be recognized for tax purposes, had taken place. *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1243 (1981). The payments under the Lease Agreement bear marked similarities to debt financing. The rents have no visible connection with the economic value of the property, but instead, reflect interest payments on advances made by IPFC. See *Sun Oil Co. v. Commissioner*, 562 F.2d at 269. As we have discussed, petitioner, as lessee, bore significant burdens, risks, and responsibilities for the nuclear fuel in addition to holding the exclusive-use rights to the fuel during its useful life, and other substantial benefits in connection therewith. These benefits and burdens are strong attributes of ownership—not of a leasehold interest. Finally, the view of the transaction by third parties, as well as petitioner's obligations under the Cash Deficiency Agreement, shows that the incidences of ownership remained with petitioner.

We therefore conclude that the sale-leaseback transaction involved herein was a financing for purposes of the Federal tax laws. Respondent's determination of gain on the "sale" portion of the arrangement will accordingly be disallowed.

## III. *Current Deductibility of the Lease Payments*

The third issue for decision is whether petitioner may deduct the liability it accrued for lease charges for its 1981 tax year.

Petitioner argues that as an accrual-basis taxpayer it is entitled to a deduction for the liabilities it accrued for its lease obligations because the obligations satisfy the so-called all-events test. Respondent contends that the deduction is not allowable, arguing that the all-events test has not been met, and alternatively, that the method used by petitioner for accounting for the lease payments does not clearly reflect income as required by section 446(b).[25] We will address these arguments in the order they were raised.

---

[25]All statutory references are to the Internal Revenue Code of 1954 as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

## The All-Events Test

Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 446(a) provides that taxable income "shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Section 446(c)(2) permits a taxpayer to compute taxable income by employment of "an accrual method." An accrual-method taxpayer is entitled to deduct an expense in the year in which it is "incurred," (sec. 162(a)), regardless of when it is actually paid.

The standard for determining when an expense is to be regarded as "incurred" for Federal tax purposes is the "all-events" test prescribed by the Income Tax Regulations. See sec. 1.446-1(c)(1)(ii), Income Tax Regs. (accruals in general); sec. 1.451-1(a), Income Tax Regs. (accrual of income); sec. 1.461-1(a)(2), Income Tax Regs. (accrual of deductions). This test appears to have originated in the Supreme Court's opinion in *United States v. Anderson*, 269 U.S. 422, 441 (1926) ("it is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it.")

The "all-events" test has two elements, each of which must be satisfied before accrual of an expense is proper. First, all of the events that determine the fact of the liability must have occurred as of the end of the year for which the taxpayer seeks to accrue the liability. Second, the taxpayer must be able to estimate with reasonable accuracy the amount of the expenditure to be made in the subsequent year, as of the end of the year for which the taxpayer seeks to accrue the liability. *United States v. Hughes Properties, Inc.*, 476 U.S. ____ (1986); *Burlington Northern Railroad v. Commissioner*, 82 T.C. 143, 147 (1984); sec. 1.446-1(c)(1)(ii), Income Tax Regs.

### (1) *The Fact of the Liability*

Respondent argues that petitioner's liability is contingent, as payments are not required to be made under the terms of the Lease Agreement until the nuclear fuel is loaded into

the Clinton Power Station and operations commence. Thus, argues respondent, as of the end of 1981, petitioner had not incurred a deductible liability under the lease, but instead had merely agreed to become liable to make lease payments in the event the nuclear fuel was utilized in the plant. We disagree.

Under the terms of the Lease Agreement, petitioner has an unconditional liability to pay to IPFC the lease obligations that accrue each month. As is explained in more detail in our findings, the lease provides three ways in which lease payments may be made. First, payments may be made each month in the form of Basic Rent.[26] Until the Clinton Power Station commences operations, Basic Rent consists of Monthly Lease Charges, which are essentially all of the financing charges incurred by IPFC in connection with its issued and outstanding commercial paper.

The second method for payment is to pay the Monthly Lease Charges as the plant becomes operational. The terms of the arrangement are such that petitioner (if it chooses) may defer the current payment of the Monthly Lease Charge until such time as burnup of the nuclear fuel commences. Once burnup begins, payments of the Monthly Lease Charge may no longer be deferred. Moreover, as the fuel is consumed, the Monthly Lease Charges which were originally deferred, as well as the current Monthly Lease Charges, are gradually paid off, with the last payment being made when all of the fuel is consumed.

During 1981, in accordance with the second method of payment, petitioner elected to defer any current payment of the Monthly Lease Charges. Hence, as the nuclear fuel is loaded into the Clinton reactor, petitioner will be required to make payments satisfying its accrued liabilities, with all such accrued liabilities being paid by the time the fuel is completely consumed.

The third method of payment under the lease occurs at the time the lease is terminated. The Lease Agreement provides that at that time, petitioner must pay IPFC an amount equal to the Net Investment Value of the fuel. The

---

[26]The lease also provides for the payment of Additional Rent from "time to time." However, neither party has argued that any portion of the accrued liability for the lease charge represented Additional Rent.

Net Investment Value of the fuel includes, inter alia, all of the accrued Monthly Lease Charges not yet paid. Thus, petitioner must in any event pay its accrued liabilities no later than the termination of the Lease Agreement on December 31, 2021.[27]

Whether the lease payments are made as Monthly Lease Charges, as the plant becomes operational, or as of the termination of the Lease Agreement, it is clear that in all events, the payments must be made. That petitioner elected to defer payments of the charges until the plant becomes operational is of no significance. The election merely affects the timing and not the certainty of payment of the accrued charge. Even if the plant never becomes operational, the liability is not contingent, as urged by respondent, but it is fixed, and must be paid in any event by the end of the lease. The following words of this Court in *Lukens Steel v. Commissioner*, 52 T.C. 764, 784-785 (1969), affd. 442 F.2d 1131 (3d Cir. 1971), are equally applicable here:

Accordingly the existence of petitioner's liability and the amount thereof were fixed during the taxable years even though the time of payment was not. * * * In no event could the contingent liability be canceled by petitioner.

Thus, as in *Lukens Steel*, we are convinced that petitioner's liability here was definite during the year in issue even though the exact time of payment was not.

There is some suggestion made by respondent that because of the possibility that the payments may be delayed for 40 years (i.e., until the end of the lease), the liability is so contingent as to render it a nullity. In applying the all-events test in *Reynolds Metals Co. v. Commissioner*, 68 T.C. 943, 960 (1977), we permitted accrual of a liability not paid until 13 years later.[28] In so holding, we indicated:

---

[27]Other provisions of the lease provide for payment of this amount if, for any reason, the Lease Agreement terminates before this date.

[28]Courts have generally permitted a deduction under the all-events test even if the liability would not be discharged until the distant future. See, e.g., *United States v. Hughes Properties, Inc.*, 476 U.S. _____ (1986) ("the accrual method itself makes irrelevant the timing factor"); *Lukens Steel Co. v. Commissioner*, 442 F.2d 1131, 1135 (3d Cir. 1971) (uncertainty of the time of payment will not prevent deductibility of any expense that is otherwise deductible under sec. 1.461, Income Tax Regs.); *Denise Coal Co. v. Commissioner*, 271 F.2d 930 (3d Cir. 1959) (payment due 11 years after accrual); *Washington Post Co. v. United States*, 405 F.2d 1279 (Ct. Cl. 1969) (payment could exceed 30 years after accrual); *Jordan v. Commissioner*, 11 T.C. 914, 925 (1948) (proper to accrue interest "even though the course of conduct of the parties indicated that the likelihood of payment of any part of the disallowed portion was extremely

The crucial point is the legal liability to pay someone at some point in time. We cannot say, if the time period for payment were so stretched as to render the ultimate liability a practical nullity, that our conclusion would remain the same. However the record does not so indicate quite such a stretch-out in the instant case. The amounts in issue for 1962 and 1963 were paid into Trust III by 1975. The payout did not occur "decades hence" and such sums were committed to the trust in the year of accrual. [Citation omitted.]

In the instant case, we need not decide whether a liability paid 40 years after accrual rises to the level of a "practical nullity" because, as of the end of 1981, there was a reasonable expectation[29] that the liability would be paid well before the end of the lease. At the time the Lease Agreement was entered into, petitioner announced in an annual report to its stockholders that the nuclear fuel was expected to be loaded[30] into the Clinton reactor in January 1983. Although there have been some delays, on the date of the trial herein (October 3, 1985), the Clinton Power Station was 97-percent complete, and Mr. Haab testified that the plant would become operational during the early part of 1986. As we have found, the Lease Agreement requires accrued liabilities to be paid as the plant becomes operational. Therefore, in our opinion this is not a situation where the time period for payment is so stretched as to render the liability a practical nullity, rather, under these circumstances there was a reasonable expectation that it would be paid in the very near future.

It is also significant that the Monthly Lease Charge is composed primarily of the interest due on the outstanding IPFC commercial paper. Interest has been defined to include the amount paid for the use of money during the term of a loan.[31] Here, the passage of time during 1981 created the

---

doubtful"); *Oxford Inst. v. Commissioner*, 33 B.T.A. 1136 (1936) (payment 10 years after accrual).

For commentary on this subject see Cunningham, "A Theoretical Analysis of the Tax Treatment of Future Costs," 40 Tax. L. Rev. 577, 580 n. 22 (1985); Jensen, "The Deduction of Future Liabilities by Accrual-Basis Taxpayers: Premature Accruals, The All Events Test, and Economic Performance," 37 U. Fla. L. Rev. 443, 469 n. 145 (1985); Aidinoff & Lopata, "Section 461 and Accrual-Method Taxpayers: The Treatment of Liabilities To Be Performed in the Future," 33 Tax Law. 789, 801-802 (1980).

[29]See *United Control Corp. v. Commissioner*, 38 T.C. 957, 969-970 (1962).

[30]Generation of electricity begins approximately 6 weeks after the nuclear fuel is loaded into the reactor. The reactor reaches full output about 9 months later.

[31]See *New England Mutual Life Ins. Co. v. Welch*, 153 F.2d 260 (1st Cir. 1946); *Penn Mutual Life Ins. Co. v. Commissioner*, 92 F.2d 962 (3d Cir. 1937); *Pan-American Life Ins. Co.*

interest due under the Monthly Lease Charge. As such, not only did a liability for interest accrue during 1981, but the liability for interest also represents petitioner's *economic cost*[32] for having financed the fuel for that same year.

We are accordingly of the opinion that petitioner adequately established the fact of the liability for the lease payments for the 1981 tax year.

### (2) *Reasonable Accuracy*

Respondent argues that the provisions of the lease are "extremely intricate" and that therefore, the actual amounts of petitioner's liability cannot be known with reasonable accuracy.

Although the provisions of the lease are complicated, there is no question that the amount of petitioner's liability for 1981 could be estimated with reasonable accuracy.[33] It is not necessary to set forth here all of the intricacies of the lease terms—they are set out in detail in our findings. For our purposes, we need only show that the lease payment for 1981 was accurately determined.

The 1981 lease payment we are concerned with is termed Basic Rent under the Lease Agreement. Basic Rent is defined in the lease as "the sum of the Monthly Lease Charge, less capitalized Monthly Lease Charges, plus the Burn-up Charge, for the preceding month."

The Monthly Lease Charge consists of three components: First, an interest charge, consisting of all interest expense and amortization of debt discount, whether or not paid, on the outstanding IPFC commercial paper; second, a borrowing charge, consisting of all of the issuing costs incurred by

---

*v. Commissioner*, 111 F.2d 366 (5th Cir. 1940), affd. 311 U.S. 272 (1940); *Fall River Electric Light Co. v. Commissioner*, 23 B.T.A. 168, 171 (1931); *DuPont v. Deputy*, 22 F. Supp. 589 (D. Del. 1938), revd. 103 F.2d 257 (3d Cir. 1939), revd. 308 U.S. 488 (1940).

[32] Although the provisions of the Deficit Reduction Act of 1984 are not applicable here, it is nevertheless noteworthy that in that context the following definition appears: "In the case of interest, economic performance occurs with the passage of time (that is, as the borrower uses, and the lender foregoes use of, the lender's money) rather than as payments are made." Staff of J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, 265 (J. Comm. Print 1984).

[33] For cases addressing the reasonable accuracy issue, see, e.g., *ESCO Corp. v. United States*, 750 F.2d 1466, 1468-1469 (9th Cir. 1985); *Gillis v. United States*, 402 F.2d 501, 507 (5th Cir. 1968); *Denise Coal Co. v. Commissioner*, 271 F.2d 930, 936-937 (3d Cir. 1959); *Hilinski v. Commissioner*, 237 F.2d 703, 705 (6th Cir. 1956); *Harrold v. Commissioner*, 192 T.C. 1002 (4th Cir. 1951). See also *Ohio River Collieries Co. v. Commissioner*, 77 T.C. 1369 (1981); *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497 (1980).

IPFC in connection with issuing the commercial paper; and third, a management charge, consisting of IPFC's projected operating expenses (which is adjusted at the end of the year for the actual operating expenses incurred), and a stated rate of return on IPFC's equity, equal to the amount used to determine the retail electric rates in effect for petitioner in the State of Illinois. From the aggregate of these three amounts is subtracted the amount of IPFC's cash income for the month on the investment of moneys received in connection with transactions contemplated by the lease (other than moneys received pursuant to the management charge). Hence, although the calculations are somewhat complex, *as of the end* of 1981, an *exact amount* could be determined for the combined total of the 12 Monthly Lease Charges for 1981.

The next component of Basic Rent is the adjustment for Capitalized Monthly Lease Charges. This component simply reflects the timing of the payments of Basic Rent rather than the amount owed. For 1981, petitioner elected to defer or "capitalize" all of the current Monthly Lease Charges.

The final component of the equation is the Burnup Charge, which only comes into effect when the Clinton reactor is operational. As the plant did not become operational during 1981, no Burnup Charges were incurred.

In sum, the sole component of Basic Rent which was *incurred* in 1981 was the Monthly Lease Charge. As we have indicated, as of the end of 1981, these charges could not only be determined with reasonable accuracy, but they could also be, and in fact were, determined *exactly*. That petitioner chose to defer these charges does not belie the fact that they were incurred—this only affects the timing of payment, an issue we have fully explored.

Under these circumstances, we therefore conclude that both facets of the all-events test have been met.

## Clear Reflection of Income

Respondent contends, citing section 446(b) and *Mooney Aircraft, Inc. v. United States*, 420 F.2d 400, 410 (5th Cir. 1969), that an allowance of a deduction to petitioner in 1981 for any liability under the Lease Agreement would result in a serious distortion of income.

In the instant matter, respondent did not raise section 446(b) in either the notice of deficiency or pleadings. Nor did petitioner present any evidence on this issue at trial. When faced with similar circumstances in *Seligman v. Commissioner*, 84 T.C. 191, 199 n. 9 (1985), affd. 796 F.2d 116 (5th Cir. 1986), we indicated:

Sec. 446(b) imposes a burden of proof upon the taxpayer to demonstrate that the Commissioner abused his discretion in changing the taxpayer's accounting method. The burden on petitioner to prove that the Commissioner abused his discretion is heavy. *Resnik v. Commissioner*, 66 T.C. 74, 78 (1976), affd. 555 F.2d 634 (7th Cir. 1977). That burden of proof is heavier than merely proving that the determination of the Commissioner is erroneous. As petitioners were not alerted to respondent's assertion of the sec. 446(b) argument by either the notices of deficiency or pleadings and, therefore, presented no evidence or argument concerning this matter, we will not consider it. *Robertson v. Commissioner*, 55 T.C. 862, 865 (1971); *Philbrick v. Commissioner*, 27 T.C. 346, 353 (1956). [Emphasis added.]

We see no reason to reach a different result here, and accordingly refuse to consider respondent's contention. *Estate of Horvath v. Commissioner*, 59 T.C. 551 (1973); Rule 31(a).

As we have found that the all-events test has been satisfied and that respondent has failed to properly raise his section 446(b) argument, a deduction for the liability incurred in 1981 under the Lease Agreement will be allowed.

## IV. *Interest Income*

The final issue for decision is whether petitioner received interest income in connection with the transfer of the nuclear fuel.

On February 2, 1981, simultaneously with the execution of the Bill of Sale, IPFC executed a document entitled "Demand Note Number 1," promising to pay to the order of petitioner $39,810,165.19 (i.e., the "purchase price" for the nuclear fuel), plus "interest." IPFC made payments on the demand note which in form were characterized as follows:

| Date | Principal | Interest | Total |
|------|-----------|----------|-------|
| Mar. 9, 1981 | $8,000,000.00 | $77,777.78 | $8,077,777.78 |
| Mar. 10, 1981 | 17,000,000.00 | 170,000.00 | 17,170,000.00 |
| Mar. 11, 1981 | 14,810,165.19 | 152,215.59 | 14,962,380.78 |
| Total | 39,810,165.19 | 399,993.37 | 40,210,158.56 |

Petitioner contends that during March 1981, IPFC issued commercial paper, in the face amount of $40,850,000, at a discount of $584,217.90, resulting in net proceeds of $40,265,782.10. Petitioner claims that IPFC used $40,210,158.56 of such proceeds to "purchase" the nuclear fuel at the price stated in the sales agreement, $39,801,165.19, plus the "interest" on the demand note ($399,973.37). Thus, argues petitioner, the $399,973.37 is merely part of the total proceeds advanced to petitioner by IPFC, and therefore, should not be treated as interest income. Respondent takes the position that the $399,973.37 was shown as interest income in petitioner's 1981 financial records and should be treated as interest income for Federal tax purposes as well.

We have already held that petitioner retained the benefits and burdens of ownership of the nuclear fuel and that the Nuclear Fuel Agreements, taken together, constituted a financing arrangement. A necessary consequence of this result is a holding that the amount in question ($399,973.37) does not constitute interest but merely represents additional principal loaned to petitioner.

In form, petitioner sold the nuclear fuel on February 2, 1981, for $39,801,165.19, and as this "purchase price" was not paid until March, an additional $399,973.37 cast as "interest" was then added to the "purchase price." In substance, IPFC became obligated to loan petitioner $39,801,165.19 in February 1981, and actually loaned petitioner $40,210,158.56 in March 1981.

This transaction can best be illustrated by the following example. If A agrees to loan $100,000 to B on February 1, but fails to deliver the proceeds until March 1, and as a result of the month delay is required to loan B $110,000, it cannot be said that the additional $10,000 is interest income to B. Interest represents an amount received for the use of money during the term of the loan. [34] In the example, B has not provided A with any funds and therefore cannot be considered to have earned interest. The result of A's failure to provide funds to B is that A foregoes interest income he would have otherwise earned. The $10,000 is simply additional principal that B is later obligated to repay.

---

[34]For cases defining "interest," see *supra* note 31.

By replacing A with IPFC, and B with petitioner, in the above example it is clear that the $399,973.37 paid by IPFC to petitioner does not represent interest income to petitioner, but merely represents additional principal.

To reflect the foregoing, as well as concessions, the case will be remanded to the general docket to await disposition of the severed issue.

*An appropriate order will be issued.*