141 T.C. No. 14

UNITED STATES TAX COURT

VECO CORPORATION AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24918-10.                    Filed November 20, 2013.

On its Federal income tax return for the taxable year ending Mar. 31, 2005 (TYE 2005), P, an accrual method taxpayer, implemented a proposed change in accounting method and in so doing accelerated deductions for parts of certain liabilities attributable to periods after the close of P's TYE 2005. R rejected P's proposed change in accounting method and denied P's claimed accelerated deductions. P claims that it was entitled to accelerate the deductions under the "all events" test of I.R.C. sec. 461 and/or the recurring item exception to the economic performance rules of I.R.C. sec. 461(h)(3). For financial statement purposes petitioner accrued the liabilities over more than one taxable year. P treated the liabilities inconsistently for financial statement and tax purposes.

Held: Because neither the required performances nor the payment due dates with respect to the majority of the accelerated deductions occurred before the close of P's TYE 2005, P failed to satisfy the first requirement of the all events test of I.R.C. sec. 461;

i.e., P failed to prove that all of the events had occurred to establish the fact of the liabilities under sec. 1.461-1(a)(2)(i), Income Tax Regs.

Held, further, with respect to the remaining accelerated deductions, P did not satisfy all of the requirements for the recurring item exception under I.R.C. sec. 461(h)(3) and, consequently, is not excepted from the general rule of I.R.C. sec. 461(h)(1) requiring economic performance, because the liabilities underlying the deductions were prorated over more than one taxable year, were treated inconsistently for financial statement and tax purposes, and were material items for tax purposes within the meaning of I.R.C. sec. 461(h)(3)(A)(iv)(I). See sec. 1.461-5(b)(4), Income Tax Regs.

Christina M. Passard, for petitioner.

Davis G. Yee and Keith G. Medleau, for respondent.

OPINION

MARVEL, Judge: On its Federal income tax return for the taxable year ending (TYE) March 31, 2005, VECO Corp. & Subsidiaries (collectively, petitioner or affiliated group), which used the accrual method of accounting, implemented a proposed change in accounting method that accelerated approximately $5,010,305 of deductions for parts of certain liabilities attributable to periods after the close of petitioner's TYE March 31, 2005. Petitioner contends

it was entitled to accelerate its deductions for these expenses under the "all events" test of section 461[1] and/or the recurring item exception to the economic performance rules under section 461(h)(3). In a notice of deficiency dated August 17, 2010, respondent disallowed the portions of the deductions attributable to periods after March 31, 2005, and accordingly determined a $1,919,359 deficiency in the Federal income tax of petitioner for TYE March 31, 2005.

After concessions,[2] the issues for decision are: (1) whether, under the all events test of section 461, petitioner properly accelerated and deducted on its Federal income tax return for TYE March 31, 2005, certain expenses attributable to periods ending after TYE March 31, 2005; (2) alternatively, whether section

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts have been rounded to the nearest dollar.

[2]With respect to the economic performance requirement of the all events test, petitioner concedes that it did not satisfy the 3-1/2-month rule of sec. 1.461-4(d)(6)(ii), Income Tax Regs., for any of the deductions in issue. With respect to the recurring item exception to the general rule of economic performance, petitioner concedes that it did not satisfy the matching requirement (i.e., the fourth requirement of the recurring item exception) under sec. 1.461-5(b)(1)(iv)(B) and (5), Income Tax Regs., for any deductions in issue, with the exception of its deduction for insurance premium expenses. Respondent concedes that petitioner satisfied the economic performance and matching requirements of the recurring item exception for petitioner's claimed deduction for insurance premium expenses. See sec. 461(h)(3)(A)(ii), (iv); sec. 1.461-5(b)(ii), (iv), Income Tax Regs.

467 prevents petitioner from using the recurring item exception under section 461(h)(3) to accelerate deductions for expenses attributable to an equipment lease and certain real estate leases;[3] and (3) if petitioner properly claimed deductions for expenses under amendment XIV to the 949 East 36th Avenue lease and the 949 East 36th Avenue commercial sublease agreement for the period after March 31, 2005, whether, under section 1.1502-13(c), Income Tax Regs., petitioner must include in income the rent petitioner received under those leases for the same period. Because we conclude that petitioner did not properly deduct the accelerated expenses attributable to periods after March 31, 2005 on its Federal income tax return for TYE March 31, 2005, we do not reach issues (2) and (3).

## Background

The parties submitted this case fully stipulated under Rule 122. We incorporate the stipulated facts, and facts drawn from stipulated exhibits, into our findings by this reference.

---

[3]These leases include the Frontier Building lease, see infra pp. 22-23, the 6411 A Street lease, see infra pp. 23-24, amendment XIV to the 949 East 36th Avenue lease, see infra pp. 25-26, and the 949 East 36th Avenue commercial sublease agreement, see infra pp. 26-27.

I.    Background

VECO Corp. is a corporation organized and existing under Delaware law with its principal office in Alaska.  VECO Corp. is the common parent of an affiliated group of corporations that includes VECO Equipment, Inc. (VECO Equipment), VECO Services, Inc. (VECO Services), VECO Alaska, Inc. (VECO Alaska),[4] VECO USA, Inc. (VECO USA),[5] VECO 36th Avenue, Inc. (VECO 36th Avenue), VECO Properties, Inc. (VECO Properties),[6] Norcon, Inc., RTX, Inc., HEBL, Inc., and VECO Federal, Inc.

Petitioner is engaged in various business activities including oil and gas field services, newspaper publishing, manufacturing, construction, equipment rental, wholesale sales, leasing, and engineering.  During years preceding and including the taxable year in issue petitioner entered into a number of service contracts, licensing contracts, insurance contracts, and real property and equipment leases, described infra.

[4]During TYE March 31, 2005, VECO Alaska was a subsidiary of VECO Services.

[5]VECO USA formerly was known as Veco Rocky Mountain, Inc. (Veco Rocky Mountain), which itself formerly was known as VECO Rapley, Inc., and/or Rapley Engineering Services, Inc. (Rapley Engineering Services).

[6]During TYE March 31, 2005, VECO Properties was a subsidiary of VECO Equipment, itself a subsidiary of VECO Corp.

Petitioner prepared consolidated financial statements in accordance with generally accepted accounting principles (GAAP) for fiscal years ending (FYE) March 31, 2005, 2006, and 2007. Petitioner maintained general ledgers and working trial balances for each member of the affiliated group for FYE March 31, 2005. For Federal income tax purposes, petitioner uses the accrual method of accounting and has a TYE March 31.

II.    Petitioner's Tax Reporting

Petitioner filed a Form 1120, U.S. Corporation Income Tax Return, for TYE March 31, 2005, on which it reported total income of $71,497,738 and claimed total deductions of $64,608,986.[7] Petitioner attached to its return a Form 3115, Application for Change in Accounting Method, for TYE March 31, 2005, requesting an accounting method change pursuant to Rev. Proc. 2005-9, 2005-1 C.B. 303.[8] Petitioner reported on an attachment to the Form 3115 that it presently

---

[7] Petitioner claimed deductions on a consolidated basis and per subsidiary. Petitioner does not have documentation to show the total expenses attributable to the software license and maintenance contracts, service contracts, real estate leases, and equipment lease on an entity-specific basis or a consolidated basis.

[8] Rev. Proc. 2005-9, sec. 1, 2005-1 C.B. 303, provides administrative procedures under which a taxpayer may obtain automatic consent to change to a method of accounting provided in sections 1.263(a)-4, 1.263(a)-5, and 1.167(a)-3(b), Income Tax Regs., for the taxpayer's second taxable year ending on or after December 31, 2003.

deducted liabilities as follows: (1) with respect to liabilities for which economic performance was satisfied by payment, petitioner capitalized the liability and amortized the payment over the life of the agreement; (2) with respect to liabilities for which economic performance was not satisfied by payment, petitioner deducted the liabilities "in the period to which they relate." Petitioner proposed a change in its accounting method to: (1) deduct liabilities in the year incurred under the all events test, with modifications under the recurring item exception for insurance and maintenance agreement payments; and (2) with respect to rent liabilities for which economic performance is not satisfied by payment, deduct the liabilities "in the year the liabilities are fixed and determinable with reasonable accuracy, and where economic performance has occurred".

Petitioner implemented its proposed change in accounting method and prepared its Form 1120 for TYE March 31, 2005, accordingly. As a result of the change in accounting method, petitioner claimed deductions for prepaid expenses and accrued expenses attributable to periods after March 31, 2005, claiming that its tax treatment of the expenses was permitted under the all events test of section 461 and/or the recurring item exception under section 461(h)(3). Those accelerated deductions are at issue here.

A.    Prepaid Expenditures

1.    Aspen Technology Agreement

On March 31, 2003, VECO Corp. and Aspen Technology, Inc. (Aspen Technology) entered into a software license and service agreement for the period from March 31, 2003, through March 31, 2009 (Aspen agreement). Under the Aspen agreement Aspen Technology licensed use of its software and agreed to provide software maintenance services to VECO Corp. VECO Corp. agreed to pay license fees over six consecutive years as follows: (1) $161,000 on April 30, 2003;[9] (2) $206,000 on March 30, 2004; (3) $212,180 on March 30, 2005; (4) $218,545 on March 30, 2006; (5) $225,102 on March 30, 2007; and (6) $231,855 on March 30, 2008. VECO Corp. also agreed to pay an annual service fee of $11,945[10] for the first effective year of the contract and an annual service fee of $38,000 for each subsequent year.

VECO Corp. made payments to Aspen Technology as follows: (1) $172,945 on June 6, 2003; (2) $39,140 on June 29, 2004; and (3) $40,314 on April

---

[9]The Aspen agreement provided that VECO Corp. had prepaid the license fees under a prior agreement by $39,000 and that the amount of the first license fee payment had been adjusted accordingly.

[10]The Aspen agreement provided that VECO Corp. had prepaid service fees of $26,055 under a prior agreement and that the first service fee payment had been adjusted accordingly.

27, 2005. In February 2006 VECO Corp. received an invoice dated February 13, 2006, from Bank of America Leasing for $218,545 with respect to the Aspen agreement. VECO Corp. paid the invoice by check dated February 24, 2006, made payable to Bank of America Leasing.

Petitioner treated $200,235,[11] which was attributable to the period April 1 to August 1, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $200,235 on its return for TYE March 31, 2005.

   2.   Primavera Agreement

Primavera provided software management services for VECO Alaska pursuant to a service agreement between Primavera and VECO Alaska that is not in the record.

Primavera issued an invoice dated December 31, 2004, for $10,600 to VECO Alaska. VECO Alaska paid the invoice by check dated April 4, 2005.

---

[11]The parties stipulated the amount and treatment of this expense for petitioner's financial accounting and tax reporting purposes. However, petitioner's summary analysis of its Schedule M-3, Net Income (Loss) Reconciliation for Corporations With Total Assets of $10 Million or More, shows that petitioner accelerated expenses attributable to the Aspen agreement of $212,180. Petitioner failed to offer any explanation, and the record contains no evidence, as to how petitioner calculated the amount of this particular accelerated deduction.

Petitioner treated $7,950,[12] which was attributable to the period April 1 to December 1, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $7,950 on its return for TYE March 31, 2005.

### 3. Surveyor's Exchange Agreement

The record does not contain a copy of the service agreement between Surveyor's Exchange Co. (Surveyor's Exchange) and VECO Alaska.

Surveyor's Exchange issued an invoice dated March 17, 2005, for $51,895 for Autocad subscription renewals to VECO Alaska. VECO Alaska paid the invoice by check dated April 14, 2005.

For financial statement purposes, petitioner recorded the Autocad expenses on a straight-line basis over the term of its contract with Surveyor's Exchange. Petitioner treated the $51,895, which was attributable to the period April 1, 2005, to March 1, 2006, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $51,895 on its return for TYE March 31, 2005.

---

[12]The $7,950 is equal to the portion of the total amount due to Primavera for services provided during the period April 1 to December 1, 2005.

### 4. Invensys Systems Agreement

In March 2004 VECO USA entered into a computer program license agreement with Invensys Systems, Inc. (Invensys), for the period March 1, 2004, through February 28, 2007 (Invensys agreement) that required VECO USA to pay total license fees of $156,522 and total maintenance fees of $23,478. The agreement required VECO USA to pay annual license and maintenance fees of $52,174 and $7,826, respectively, on March 1, 2004, 2005, and 2006.

Invensys issued to VECO USA an invoice dated March 22, 2004, for $64,920 covering the period from March 1, 2004, to February 28, 2007.[13] VECO USA paid the invoice by a check dated April 28, 2004.

For financial statement purposes, petitioner recorded the Invensys agreement expenses on a straight-line basis over the term of the agreement. Petitioner treated $59,420,[14] which was attributable to the period April 1 to December 15, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $59,420 on its return for TYE March 31, 2005.

---

[13]The difference between the $60,000 specified under the Invensys agreement and the $64,920 on the invoice is attributable to sales tax.

[14]Petitioner failed to offer any explanation, and the record contains no evidence, as to how petitioner calculated the amount of this particular deduction.

B.     Expenditures Accrued for Periods After March 31, 2005

    1.     Service Contracts

        a.     Marsh Agreement

On January 10, 2005, VECO Corp. entered into an insurance brokerage service agreement with Marsh USA, Inc. (Marsh), for the period January 10 through December 31, 2005 (Marsh agreement).  Under the Marsh agreement VECO Corp. agreed to pay Marsh a fixed fee of $300,000 payable as follows:  (1) $75,000 on February 1, 2005; (2) $30,000 on April 1, 2005; (3) $45,000 on June 30, 2005; (4) $75,000 on September 30, 2005; and (5) $75,000 on December 31, 2005.  VECO Corp. made payments to Marsh as follows:  (1) $60,000 on March 4, 2005; (2) $120,000 on April 1, 2005; (3) $45,000 on June 17, 2005; and (4) $75,000 on October 3, 2005.

For financial statement purposes petitioner recorded the expenses under the Marsh agreement on a straight-line basis over the term of the agreement. Petitioner treated $225,000,[15] which was attributable to the period April 1 to December 31, 2005, as an FYE March 31, 2006, expense on its financial

---

[15]Petitioner calculated this amount by adding the amounts of the four payments it made during 2005 and then multiplying that total by 75%.

statements for that year. However, petitioner deducted the $225,000 on its return for TYE March 31, 2005.

b.    ACS Agreement

The record does not contain a copy of the service agreement between ACS and VECO Alaska.

For financial statement purposes petitioner recorded the expenses under the ACS agreement on a straight-line basis over the term of the agreement. Petitioner treated $14,779,[16] which was attributable to the period April 1 to December 31, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $14,779 on its return for TYE March 31, 2005.

c.    Schwamm & Frampton Agreement

In February 1999 VECO Properties entered into a management agreement with Schwamm & Frampton, LLC (Schwamm & Frampton), for a term of one year, which automatically was renewed in February of each year (Schwamm & Frampton agreement). Under the agreement Schwamm & Frampton agreed to provide property management services for University Plaza, a property owned by

---

[16]Petitioner's summary analysis of its Schedule M shows that VECO Alaska was required to make monthly payments to ACS of $1,739. While petitioner's accounts payable vendor history distribution to ACS shows that VECO Alaska made fairly regular payments to ACS, the payments made during 2004-05 ranged from $1,321 to $1,324 per month.

VECO Properties, and to act as agent for VECO Properties. VECO Properties agreed to make monthly payments equal to the greater of: (1) $6,250 or (2) 4% of the monthly gross rental receipts, as VECO Properties received such receipts.

During FYE March 31, 2005, VECO Properties made one payment of $460 to Schwamm & Frampton. On April 20, 2005, VECO Properties made a payment of $7,500 to Schwamm & Frampton.

For financial statement purposes petitioner recorded the expenses under the Schwamm & Frampton agreement on a straight-line basis over the term of the agreement. Petitioner treated $6,250, which was attributable to the period April 1 to April 30, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $6,250 on its return for TYE March 31, 2005.

### d. Otis Elevator Agreement

In February 2002 Schwamm & Frampton, as agent for VECO Properties, entered into a maintenance agreement with Otis Elevator Co. (Otis Elevator) for the period February 1, 2002, through January 31, 2007 (Otis Elevator agreement). Under the agreement Otis Elevator agreed to provide maintenance services at University Plaza for a fee of $1,950 per month, and Schwamm & Frampton agreed to make quarterly payments on or before the last day of the month before the

billing period.[17]  Neither VECO Corp. nor VECO Properties made any direct payments to Otis Elevator.

For financial statement purposes petitioner recorded the expenses under the Otis Elevator agreement on a straight-line basis over the term of the agreement. Petitioner treated $16,575,[18] which was attributable to the period April 1 to December 15, 2005, as an FYE March 31, 2006, expense on its financial statements for that year.  However, petitioner deducted the $16,575 on its return for TYE March 31, 2005.

### e.  Q-1 Agreement

In September 1999 Schwamm & Frampton, as agent for VECO Properties, entered into a maintenance agreement with Q-1 Corp. (Q-1) for the period September 15, 1999, through September 14, 2000, with automatic renewal each year (Q-1 agreement).  Under the Q-1 agreement VECO Properties agreed to make monthly payments of $9,984 for maintenance services, with payment due in arrears on the 10th day of the month following provision of the services.  In

---

[17]The Otis Elevator agreement further provided that the billing period would begin on February 1, 2002, the commencement date.

[18]The $16,575 is equal to the monthly payment rate for April through November 2005 plus an additional $975 attributable to the monthly payment rate for the first half of December 2005.

November 2005 VECO Properties and Q-1 amended the Q-1 agreement to provide for a monthly fee of $9,221.

For financial statement purposes, petitioner recorded the expenses under the Q-1 agreement on a straight-line basis over the term of the agreement. Petitioner treated $59,940,[19] which was attributable to the period April 1 to October 15, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $59,940 on its return for TYE March 31, 2005.

### 2. Insurance Premium Agreement

On April 28, 2005, VECO Corp. entered into a commercial premium finance agreement with Marsh, an insurance broker, for insurance policies with effective dates of April 1, 2005, for 12 months of coverage (insurance premium agreement). The agreement provided for total premiums of $3,445,037 and required VECO Corp. to make 10 monthly payments of $316,714 beginning May 1, 2005.

---

[19]Although the Q-1 agreement was not amended until November 2005, petitioner's summary analysis of its Schedule M shows that petitioner calculated the amount of the deduction on the basis of a monthly fee of $9,221 for the 6-1/2-month period from April 1 to October 15, 2005.

On its return for TYE March 31, 2005, petitioner deducted $2,304,165[20] for insurance premium expenses attributable to the period April 1 to December 15, 2005.

### 3. Real Property Leases

#### a. Arctic Spur Lease

On June 24, 2004, VECO Equipment entered into a lease agreement with Arctic Spur Investments (Arctic Spur) for property at 6411 A Street, Anchorage, Alaska (Arctic Spur lease). The term of the Arctic Spur lease was July 1, 2004, through June 30, 2005. Under the Arctic Spur lease VECO Equipment agreed to pay monthly rent of $7,500 on the first day of each month.

For financial and tax accounting purposes VECO Corp. allocated $3,674 of the monthly rent to itself and $3,827 to VECO Alaska. For financial statement purposes petitioner recorded the expenses under the Arctic Spur lease on a straight-line basis over the term of the lease.

Petitioner treated $11,022 and $11,480, which were attributable to the period April 1 to June 30, 2005, as FYE March 31, 2006, expenses on its financial

---

[20]Petitioner calculated this amount by multiplying the total premium by 81.96%, a figure purportedly equal to the amount of the premium for the period May 1, 2005, through February 1, 2006, that petitioner had paid by December 15, 2005.

statements for that year.  However, petitioner deducted the $11,021 (paid through VECO Corp.) and the $11,480 (paid through VECO Alaska) on its return for TYE March 31, 2005.

### b.    Wyoming Lease

On September 25, 1996, VECO USA entered into a lease with Rock Spring Plaza, LLC, for office space at a property in Wyoming (Wyoming lease).  On September 1, 2004, VECO USA and TRB #3 Owners Corp., owner of the Wyoming property, amended the original lease to extend the term for one year from September 1, 2004, to August 31, 2005.  Under the Wyoming lease as amended VECO USA agreed to make monthly rent payments of $1,694 on the first day of each month.

For financial statement purposes petitioner recorded the expenses under the Wyoming lease on a straight-line basis over the term of the lease.  Petitioner treated $8,468, which was attributable to the period April 1 through August 31, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $8,468 on its return for TYE March 31, 2005.

c.    Golden Lease

On April 17, 1999, Veco Rocky Mountain entered into a lease with Gold Office Building for office space at a property in Golden, Colorado (Golden lease). On February 24, 2005, VECO USA and Gold Office Building amended the original lease to extend the term for a period of one year beginning March 1, 2005, and ending February 28, 2006.  Under the lease as amended VECO USA agreed to pay monthly rent of $4,410 on the first day of each month.

For financial statement purposes petitioner recorded the expenses under the Golden lease on a straight-line basis over the term of the lease.  Petitioner treated $34,359,[21] which was attributable to the period April 1 through December 15, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $34,359 on its return for TYE March 31, 2005.

d.    Durango Lease

On June 1, 2004, VECO USA entered into a lease with Lunceford Investments for office space in Durango, Colorado (Durango lease).  The term of the Durango lease was June 1, 2004, through May 31, 2005.  Under the Durango

---

[21]Petitioner's summary analysis of its Schedule M shows that petitioner calculated this amount using a monthly rent of $4,042 rather than the $4,410 provided for under the Golden lease as amended.

lease VECO USA agreed to make monthly rent payments of $2,067 on or before the first day of the month.

For financial statement purposes petitioner recorded the expenses under the Durango lease on a straight-line basis over the term of the lease. Petitioner treated $4,134, which was attributable to the period April 1 through May 31, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $4,134 on its return for TYE March 31, 2005.

### e.     Bay Street Lease

On January 1, 2005, VECO USA entered into a lease agreement with Bay Building LLC (Bay Building) for office space in Bay Street, Washington (Bay Street lease). The term of the Bay Street lease was January 1, 2005, through December 31, 2009. Under the Bay Street lease, VECO USA agreed to pay Bay Building monthly rent of $33,990 before the first day of each month.

For financial statement purposes petitioner recorded the expenses under the Bay Street lease on a straight-line basis over the term of the lease. Petitioner treated $294,696,[22] which was attributable to the period April 1 through December 15, 2005, as an FYE March 31, 2006, expense on its financial statements for that

---

[22]Petitioner's summary analysis of its Schedule M shows that petitioner calculated this amount using a monthly rent rate of $34,670 rather than the $33,990 provided for under the Bay Street lease.

year.  However, petitioner deducted the $294,696 on its return for TYE March 31, 2005.

### f.      Englewood Lease

On May 26, 1994, Rapley Engineering Services entered into a lease agreement with Highland Court LLC for office space in Englewood, Colorado (Englewood lease).  The term of the lease was July 1, 1994, through June 30, 2000.  On December 16, 2002, Veco Rocky Mountain and Prentiss Properties amended the Englewood lease to extend the term for five years, from August 1, 2002, through June 30, 2007.  Under the Englewood lease as amended, Veco Rocky Mountain agreed to pay monthly base rent of $43,450 on or before the first day of each month.

For financial statement purposes, petitioner recorded the expenses under the Englewood lease on a straight-line basis over the term of the lease.  Petitioner treated $380,103,[23] which was attributable to the period April 1 through December 15, 2005, as an FYE March 31, 2006, expense on its financial statements for that year.  However, petitioner deducted the $380,103 on its return for TYE March 31, 2005.

_____

[23]Petitioner's summary analysis of its Schedule M shows that petitioner calculated this amount using a monthly rent of $44,718 rather than the $43,450 provided for under the Englewood lease as amended.

g.        Frontier Building Lease

On March 22, 2000, VECO Corp. entered into a lease agreement with

Frontier Building Limited Partnership for space at the Frontier Building in

Anchorage, Alaska (Frontier Building lease).  The term of the Frontier Building

lease was July 1, 2000, through November 30, 2005.  The Frontier Building lease

required VECO Corp. to pay a fixed minimum monthly rent, subject to increases

based on the Anchorage Consumer Price Index,[24] on the first day of each month.[25]

For the period October 1, 2003, to September 30, 2004, the fixed minimum

monthly rent was $17,569.  For the period October 1, 2004, to September 30,

2005, the fixed minimum monthly rent was $17,939.[26]

---

[24]For 2004 the Anchorage Consumer Price Index had a percentage change of 2.58%.  For 2005 the Anchorage Consumer Price Index had a percentage change of 3.06%.

[25]For the period from October 1, 2003, through September 30, 2004, VECO Corp. paid the following amounts under the Frontier Building lease:  October 2003--$18,582; November 2003--$18,666; December 2003--$18,666; January 2004--$19,318; February 2004--$19,318; March 2004--$19,318; April 2004--$19,318; May 2004--$21,116; June 2004--$19,318; July 2004--$19,318; August 2004--$19,318; and September 2004--$19,318.

[26]The fixed minimum monthly rent of $17,939 for the period October 1, 2004, to September 30, 2005, was less than a 2.58% increase from the monthly rent that VECO Corp. paid for the period October 1, 2003, to September 30, 2004.

For financial statement purposes petitioner recorded the expenses under the Frontier Building lease on a straight-line basis over the term of the lease. Petitioner treated $107,637,[27] which was attributable to the period April 1 through September 30, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $107,637 on its return for TYE March 31, 2005.

### h. 6411 A Street Lease

On December 22, 1999, VECO Equipment entered into a lease with Carr-Gottstein Foods Co. for property at 6411 A Street, Anchorage, Alaska (6411 A Street lease). The term of the lease was March 1, 2000, to December 31, 2010. The 6411 A Street lease required VECO Equipment to pay a fixed minimum monthly rent on the first day of each month. For the period March 1, 2004, to February 28, 2005, the fixed minimum monthly rent was $54,599. For the period March 1, 2005, to February 28, 2006, the fixed minimum monthly rent was $60,626.[28]

---

[27] Petitioner's summary analysis of its Schedule M shows that petitioner calculated this amount using a monthly payment rate of $17,939.

[28] The fixed minimum monthly rent of $60,626 for the period March 1, 2005, to February 28, 2006, was less than a 2.58% increase from the monthly rent that petitioner paid for the period October 1, 2003, to September 30, 2004.

For financial statement purposes, petitioner recorded the expenses under the 6411 A Street lease on a straight-line basis over the term of the lease. Petitioner treated $515,324,[29] which was attributable to the period April 1 through December 15, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner deducted the $515,324 on its return for TYE March 31, 2005.

### i. 949 East 36th Avenue

On or about August 22, 1995, VECO Engineering entered into a lease agreement with Alaska Pacific University to rent property at 949 East 36th Avenue, Anchorage, Alaska (949 East 36th Avenue lease). Under the 949 East 36th Avenue lease VECO Engineering agreed to make monthly rent payments on or before the first day of the month. VECO Engineering and Alaska Pacific University subsequently entered into a number of agreements amending the lease to extend the term of the lease and to provide VECO Engineering with increased space at the 949 East 36th Avenue property.

On March 1, 1999, VECO Properties and VECO Engineering entered into an agreement to amend the lease to extend the term to December 31, 2005,

---

[29]Petitioner's summary analysis of its Schedule M shows that petitioner calculated this amount using a monthly payment rate of $60,626.

effective upon the closing of the acquisition of the 949 East 36th Avenue property by VECO Properties. On or about March 7, 1999, Alaska Pacific University assigned its interest in the lease to petitioner. As of September 1, 1999, VECO Engineering assigned its interest in the lease to VECO Alaska.

(i)     Amendment XIV to the 949 East 36th Avenue Lease

VECO Properties, as landlord, and VECO Alaska, as tenant, subsequently amended the 949 East 36th Avenue lease numerous times to provide VECO Alaska with increased rental space. All of the amendments extended the term of the lease to December 31, 2005, except for amendment No. XIV to the 949 East 36th Avenue lease (amendment XIV to the 949 East 36th Avenue lease). Amendment XIV to the 949 East 36th Avenue lease provided for a lease term of April 12, 2004, to April 11, 2006, for 11,971 square feet of space on the fourth floor of the 949 East 36th Avenue property at a monthly rent of $25,546 for the first year and $25,890 for the second year.

For financial statement purposes petitioner recorded the expenses under amendment XIV to the 949 East 36th Avenue lease on a straight-line basis over

the term of the amended lease. Petitioner treated $220,066,[30] which was attributable to the period April 1 through December 15, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner, through VECO Alaska, deducted the $220,066 on its return for TYE March 31, 2005. Petitioner did not include the $220,066 as rental income of VECO Properties on its return for TYE March 31, 2005.

> (ii) <u>949 East 36th Avenue Commercial Sublease Agreement</u>

On June 1, 2005, VECO Corp. entered into a commercial lease agreement with VECO 36th Avenue regarding the 949 East 36th Street property (949 East 36th Avenue commercial lease agreement). The term of the lease was June 1, 2005, to May 31, 2020. Under the 949 East 36th Avenue commercial lease agreement VECO Corp. agreed to pay monthly rent of $222,499 on or before the first day of each month, with increases in the monthly rent based on the Consumer Price Index.

On June 1, 2005, VECO Corp. entered into a commercial sublease agreement with VECO Alaska regarding the 949 East 36th Avenue property (949 East 36th Avenue commercial sublease agreement). The term of the sublease was

---

[30]Petitioner's summary analysis of its Schedule M shows that petitioner calculated this amount using a monthly payment rate of $25,890.

June 1, 2005, to May 31, 2020. Under the 949 East 36th Avenue commercial sublease agreement VECO Alaska agreed to pay monthly rent of $224,206 on or before the first day of each month, with increases in the monthly rent based on the Consumer Price Index.

For financial statement purposes, petitioner recorded the expenses under the 949 East 36th Avenue commercial sublease agreement on a straight-line basis over the term of the sublease agreement. Petitioner treated $221,070,[31] which was attributable to a two-month rental period commencing after March 31, 2005, as an FYE March 31, 2006, expense on its financial statements for that year. However, petitioner, through VECO Alaska, deducted the $221,070 on its return for TYE March 31, 2005. Petitioner did not include the $221,070 as rental income on its return for TYE March 31, 2005.

4. IKON Equipment Lease

On May 21, 2004, VECO Services and IKON Financial Services (IKON) entered into an equipment lease (IKON equipment lease) for a term of 60 months. Under the IKON equipment lease and the accompanying product schedule, VECO

---

[31]Petitioner's summary analysis of its Schedule M shows that petitioner calculated this amount using a monthly payment rate of $110,535. Petitioner failed to offer any explanation, and the record contains no evidence, as to why petitioner used a monthly payment rate of $110,535 rather than the amount specified in the 949 East 36th Avenue commercial sublease agreement.

Services agreed to make monthly rent payments of $25,785, with the first payment made on or before the effective date[32] and the remaining payments made on the same day each month. On January 14, 2005, VECO Alaska and IKON amended the IKON equipment lease to provide for an increased minimum monthly payment of $27,780. On April 13, 2005, VECO Services and IKON amended the IKON equipment lease to provide for an increased minimum monthly payment of $28,002. On March 28, 2007, VECO Services and IKON amended the IKON equipment lease to provide for an increased minimum monthly payment of $37,128.

Petitioner treated $225,738,[33] which was attributable to the period April 1 through December 15, 2005, as an FYE March 31, 2006, expense in its financial statements for that year. However, petitioner deducted the $255,739 on its return for TYE March 31, 2005.

----

[32]The record does not show the effective date of the IKON equipment lease. VECO Services entered into the master agreement with respect to the IKON equipment lease on May 21, 2004, and entered into the product schedule on July 15, 2004.

[33]Petitioner's summary analysis of its Schedule M shows that petitioner calculated this amount using a monthly rental rate of $30,087 rather than the rate provided for under the IKON equipment lease as amended.

III.    Notice of Deficiency

Respondent issued to petitioner the notice of deficiency for TYE March 31, 2005, determining that petitioner was not permitted to change its method of accounting for its prepaid and accrued expenditures.  Accordingly, respondent disallowed portions of petitioner's claimed deductions as follows:  (1) $200,235 under the Aspen agreement; (2) $7,950 under the Primavera agreement; (3) $51,895 under the Surveyor's Exchange agreement; (4) $59,420 under the Invensys agreement; (5) $225,000 under the Marsh agreement; (6) $14,779 under the ACS agreement; (7) $16,575 under the Otis Elevator agreement; (8) $6,250 under the Schwamm & Frampton agreement; (9) $59,940 under the Q-1 agreement; (10) $2,304,165 under the insurance premium agreement; (11) $22,501 under the Arctic Spur lease; (12) $8,468 under the Wyoming lease; (13) $34,359 under the Golden lease; (14) $4,134 under the Durango lease; (15) $294,696 under the Bay Street lease; (16) $380,103 under the Englewood lease; (17) $107,637 under the Frontier Building lease; (18) $515,324 under the 6411 A Street lease; (19) $220,066 under amendment XIV to the 949 East 36th Avenue lease; (20) $221,070 under the 949 East 36th Avenue commercial sublease agreement; and (21) $255,738 under the IKON equipment lease.  Respondent determined that petitioner was not entitled to these deductions because:  (1) petitioner failed to

establish that it incurred the related expenses during TYE March 31, 2005[34] and (2) petitioner's method of claiming the deductions did not clearly reflect income within the meaning of section 446(b). Respondent alternatively determined that if VECO Alaska was entitled to deductions of $220,066 and $221,070 for expenses under amendment XIV to the 949 East 36th Avenue lease and the 949 East 36th Avenue commercial sublease agreement, VECO Properties was required to recognize the receipt of income to that extent under section 1.1502-13, Income Tax Regs.

## Discussion

### I.    Burden of Proof

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that the determinations are erroneous.[35]  See Rule 142(a); Welch v. Helvering, 290 U.S.

_____

[34]Respondent also determined that even if petitioner satisfied the all events test of sec. 461 for the claimed deductions, petitioner was required to capitalize those amounts under sec. 263(a).

[35]Where a taxpayer has requested the Commissioner's consent to change its method of accounting, this Court generally reviews the Commissioner's refusal to give consent for abuse of discretion.  See Capitol Fed. Sav. & Loan Ass'n v. Commissioner, 96 T.C. 204, 209-210 (1991).  The use of an abuse of discretion standard is premised on the idea that the Commissioner's "determination with respect to the issue of whether income is reflected clearly is entitled to more than

(continued...)

111, 115 (1933). However, if a taxpayer produces credible evidence with respect to a factual issue relevant to ascertaining the taxpayer's Federal income tax liability, the burden of proof as to that issue may shift to the Secretary[36] under section 7491(a)(1) if the taxpayer satisfies certain requirements under section 7491(a)(2).[37]

---

[35](...continued)
the usual presumption of correctness." Id. at 209.

In the notice of deficiency respondent rejected petitioner's attempt to change its former method of accounting with respect to the disputed deductions. Respondent explained that petitioner had failed to establish that petitioner incurred the expenses attributable to the disputed deductions in its TYE March 31, 2005, and in addition, petitioner's method of claiming the disputed deductions did not clearly reflect income within the meaning of sec. 446(b). However, in respondent's brief respondent argues only that petitioner failed to establish that it incurred the expenses attributable to the disputed deductions in its TYE March 31, 2005. Respondent does not contend that this Court should review respondent's determinations in the notice of deficiency for abuse of discretion.

[36]The term "Secretary" means "the Secretary of the Treasury or his delegate", sec. 7701(a)(11)(B), and the term "or his delegate" means "any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context", sec. 7701(a)(12)(A)(i).

[37]If the taxpayer is a partnership, a corporation, or a trust (other than a qualified revocable trust as defined in sec. 645(b)(1)), sec. 7491(a)(2) requires the taxpayer to establish, among other things, that it meets the requirements of sec. 7430(c)(4)(A)(ii) (which in turn references the net worth requirements of 28 U.S.C. sec. 2412(d)(2)(B)).

Petitioner does not argue that section 7491(a)(1) shifts the burden of proof to respondent. In addition, petitioner has not established (nor do we find) that it satisfied the requirements of section 7491(a)(2). Petitioner bears the burden of proof. See Rule 142(a).

## II. The All Events Test

### A. Introduction

Section 461(a) provides that a deduction must be taken for the proper taxable year under the taxpayer's method of accounting. Accrual method taxpayers generally are allowed a deduction for the year in which the taxpayer incurred the expense, regardless of the actual date of payment. Sec. 461(h)(4); sec. 1.461-1(a)(2), Income Tax Regs.; see also Interex, Inc. v. Commissioner, 321 F.3d 55, 58 (1st Cir. 2003) ("Accrual method taxpayers may deduct expenses when they are incurred even if they have not yet been paid[.]"), aff'g T.C. Memo. 2002-57.[38]

_____

[38]Conversely, a taxpayer may not deduct either a prepaid amount or an amount paid without a legal obligation to do so any earlier than the taxable year in which such amount is incurred. Sec. 1.446-1(c)(ii)(B), Income Tax Regs. Accordingly, we need not consider the amount and timing of payments petitioner actually made with respect to each of the liabilities because even if petitioner made such payment during TYE March 31, 2005, petitioner is not entitled to a deduction for the related expense unless petitioner also incurred a liability for that expense during TYE March 31, 2005.

Whether an accrual method taxpayer has incurred an expense is determined under the "all events test". See sec. 1.461-1(a)(2)(i), Income Tax Regs. Under the all events test, "a liability * * * is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability." Id.; see also United States v. Gen. Dynamics Corp., 481 U.S. 239, 242-243 (1987); United States v. Anderson, 269 U.S. 422, 441 (1926); Caltex Oil Venture v. Commissioner, 138 T.C. 18, 23 (2012). An accrual basis taxpayer claiming that it incurred a liability for Federal income tax purposes must satisfy each of the three requirements under the all events test in order to claim a deduction for the liability.

Respondent does not dispute that the second requirement of the all events test (i.e., that the amount of the liability was determinable with reasonable accuracy) was satisfied with respect to the disputed deductions. Rather, respondent disputes whether the first and third requirements were satisfied. With respect to the disputed deductions attributable to the Marsh, ACS, Schwamm & Frampton, Otis Elevator, and Q-1 agreements, as well as the insurance premium expense deduction and the real property and equipment lease expense deductions,

respondent contends that the first requirement of the all events test was not satisfied because all the events had not occurred to establish the fact of these liabilities as of March 31, 2005. With respect to all of the deductions except the insurance premium expense deduction, respondent contends that the third requirement (economic performance) of the all events test was not satisfied because: (1) the 3-1/2-month rule of section 1.461-4(d)(6)(ii), Income Tax Regs., does not apply and (2) petitioner is not entitled to rely on the recurring item exception to the economic performance requirement.

Petitioner contends that it satisfied each requirement of the all events test. Petitioner argues that it satisfied the first requirement because its execution of the relevant agreements, and assumption of binding legal obligations thereunder, fixed the fact of the liabilities underlying the disputed deductions. Petitioner also argues that it satisfied the economic performance requirement because the recurring item exception of section 461(h)(3) applies.

We first address respondent's contention that the fact of petitioner's liabilities under the Marsh, ACS, Schwamm & Frampton, Otis Elevator, and Q-1 agreements, the insurance premium agreement, and the real property and equipment rental agreements was not fixed as of the close of the taxable year in issue. We then analyze whether there was economic performance with respect to

the disputed deductions.  If petitioner was entitled to rely on the recurring item

exception with respect to the disputed deductions, then the economic performance

requirement of the all events test is satisfied.

B.     Fact of the Liability

The term "liability" refers to "any item allowable as a deduction, cost, or

expense for Federal income tax purposes."  Sec. 1.446-1(c)(ii)(B), Income Tax

Regs.  Generally, the fact of a liability is established on the earlier of:  (1) the

event fixing the liability, such as the required performance or (2) the date the

payment is unconditionally due.  See Rev. Rul. 2007-3, 2007-1 C.B. 350; Rev.

Rul. 80-230, 1980-2 C.B. 169; Rev. Rul. 79-410, 1979-2 C.B. 213.

Petitioner argues that actual payment of an expense is not required to

establish the fact of the liability.[39]  As discussed supra, an accrual method taxpayer

may deduct an expense for a taxable year before the year in which the taxpayer

actually remits payment provided that the taxpayer incurred the expense during the

---

[39]Petitioner also argues that "courts have repeatedly rejected the
Respondent's arguments that a liability is not fixed until the time has come for
payment of the obligation."  Petitioner, however, overstates respondent's
argument.  Respondent contends that all events have occurred to establish the fact
of a taxpayer's liability upon the earlier of the event fixing the liability or the
payment due date.  Accordingly, respondent contends that a liability may be fixed
before the payment due date provided that the event fixing the liability already
occurred.  Furthermore, in respondent's answering brief, respondent specifically
acknowledges that "actual payment is not required to fix the liability."

taxable year for which it claimed the deduction. Sec. 461(h)(4); sec. 1.461-1(a)(2), Income Tax Regs.; see also United States v. Hughes Props. Inc., 476 U.S. 593, 599 (1986); Interex, Inc. v. Commissioner, 321 F.3d at 57-58. "[A]lthough expenses may be deductible before they have become due and payable, liability must first be firmly established." Gen. Dynamics Corp., 481 U.S. at 243. Accordingly, we agree with petitioner that actual payment is not necessarily required to establish that petitioner's liability for an expense is fixed under the all events test.

Petitioner argues that upon its entering into the various agreements, its liabilities under those agreements became fixed by virtue of its assumption of the contractual obligations. Although petitioner and respondent agree that a statute[40] or regulation sometimes may operate to fix a taxpayer's liability, the parties disagree regarding whether petitioner's execution of each agreement constituted an event that fixed petitioner's liability for the entire obligation under the agreement.

---

[40]Furthermore, this Court has held that the fact that a liability is fixed by statute does not control whether the liability is fixed for purposes of the all events test. See Chrysler Corp. v. Commissioner, T.C. Memo. 2000-283, aff'd, 436 F.3d 644 (6th Cir. 2006).

The execution of a contract contemplating payment, without more, is not an event that fixes the payor's liability. See Spencer, White & Prentis v. Commissioner, 144 F.2d 45, 47 (2d Cir. 1944) ("It is well settled that deductions may only be taken for the year in which the taxpayer's liability to pay becomes definite and certain, even though the transactions (such as the contract in the present case) which occasioned the liability, may have taken place in an earlier year."). In particular, where a contract "contains mutually dependent promises, liability under it is contingent upon performance or tendered performance", and is not fixed by merely entering into the contract. Levin v. Commissioner, 219 F.2d 588, 589 (3d Cir. 1955), aff'g 21 T.C. 996 (1954); see also Gulf Oil Corp. v. Commissioner, 914 F.2d 396, 409 (3d Cir. 1990) ("Unconditional liability under an executory contract is not created until at least one party performs."), aff'g 86 T.C. 115 (1986). For example, this Court has held that taxpayers who entered into a contract in year 1 for the provision of services in years 1 and 2 were not entitled to deduct the entire amount of the contract price in year 1 because they had not incurred the entire amount of the liability in year 1. Levin v. Commissioner, 21 T.C. 996.[41] In so holding, this Court stated that "it has been well established that

---

[41]In Levin v. Commissioner, 21 T.C. 996 (1954), aff'd, 219 F.2d 588 (3d Cir. 1955), the taxpayers were partners in a business that manufactured, produced,

(continued...)

the accrual method of accounting does not permit the anticipation in the taxable

year of future expenses in other years prior to the rendition of the services fixing

the liability for which the payment is to be made." Id. at 999.

Petitioner cites numerous cases that it claims stand for the proposition that

the execution of a contract fixes a taxpayer's liability for the entire amount of the

contract price.[42]  None of the cases, however, stand for the proposition that the

---

[41](...continued)
and sold food products.  On December 12, 1946, the business entered into an advertising contract with a two-year term.  Id. at 996-997.  Under the terms of the contract, the taxpayers were to pay the advertising agent $733 per month in exchange for the advertisement of their food products.  Id.  On December 17, 1946, the advertising agent sent to the taxpayers an invoice for services rendered from December 5, 1946, to December 4, 1947.  Id. at 997.  The partnership, which used an accrual method of accounting, accrued the entire amount of the invoice on its books for the TYE December 31, 1946, although the partnership did not begin making payments on the invoice until February 10, 1947.  Id.

The Court held that the partnership was not entitled to accrue the entire amount of the invoice for Federal income tax purposes.  Id. at 998-999.  In so holding, the Court stated that under the contract the taxpayers "incurred no liability but merely agreed to become liable to pay in the event the future services called for were performed."  Id. at 998.  The Court further acknowledged that the measure of an obligation to pay for future services was not the contract price but rather "a contingent response in damages" for breach of the contract.  Id. at 998-999.  The U.S. Court of Appeals for the Third Circuit affirmed the decision of this Court, stating that "[r]endition of the services was a condition precedent to any obligation of the partnership to pay."  Levin v. Commissioner, 219 F.2d at 589.

[42]Petitioner also cites Amalgamated Hous. Corp. v. Commissioner, 37 B.T.A. 817 (1938), aff'd, 108 F.2d 1010 (2d Cir. 1940), in support of this

(continued...)

execution of a contract, without more, establishes the fact of the taxpayer's liability for the entire amount due under the contract. Rather, in each of the cited cases, the court examined the relevant contract to decide when the liability became fixed. See Commissioner v. H.B. Ives Co., 297 F.2d 229 (2d Cir. 1961), rev'g T.C. Memo. 1959-187; Willoughby Camera Stores, Inc. v. Commissioner, 125 F.2d 607, 608-609 (2d Cir. 1942), rev'g 44 B.T.A. 520 (1941); Helvering v. Russian Fin. & Constr. Corp., 77 F.2d 324, 327 (2d Cir. 1935); Wash. Post Co. v. United States, 405 F.2d 1279, 1283 (Ct. Cl. 1969); Burnham Corp. v. Commissioner, 90 T.C. 953, 957-958 (1988), aff'd, 878 F.2d 86 (2d Cir. 1989); Ill. Power Co. v. Commissioner, 87 T.C. 1417, 1443-1447 (1986); Champion Spark

---

[42](...continued)
contention. In particular, petitioner contends that in Amalgamated Hous. Corp., the Court held that the taxpayer's liability for service payments was not fixed because the taxpayer had not entered into a binding contract with a service provider and the services were not yet required under State housing law. In Amalgamated Hous. Corp. v. Commissioner, 37 B.T.A. at 829, the taxpayers were required under State law to make renovations at the end of particular periods of months and accordingly "set up a reserve from the rent received during that period sufficient to pay for" the renovations. The Court held the taxpayers could not accrue the renovation costs as expenses before the end of the relevant period, as defined by State law, or the time that renovation services were rendered. Id. The Court did not discuss the effect, if any, of the taxpayers' lack of a service contract under which a third party agreed to provide renovation services. Amalgamated Hous. Corp. does not stand for the proposition for which it is cited by petitioner.

Plug Co. v. Commissioner, 30 T.C. 295, 298 (1958), aff'd, 266 F.2d 347 (6th Cir. 1959). The cited cases are distinguishable as explained below.

Two of the cases address the treatment of payments made under a unilateral contract. See Burnham Corp. v. Commissioner, 90 T.C. 953;[43] Champion Spark Plug Co. v. Commissioner, 30 T.C. 295.[44] The agreements at issue here are not unilateral; each party is obligated to perform the undertakings specified therein, and petitioner is required to make payments over the term of the contract in exchange for goods or services to be provided.

Three of the cases involve situations where the required performance from one of the contracting parties occurred in one taxable year but the other contracting party did not actually make the associated payment until the following taxable year. Willoughby Camera Stores, Inc. v. Commissioner, 125 F.2d at 608-

---

[43]Burnham Corp. v. Commissioner, 90 T.C. 953 (1988), aff'd, 878 F.2d 86 (2d Cir. 1989), involved a contract under which the taxpayer agreed to make monthly payments for the remainder of an individual's life. The Court held that the taxpayer was entitled to deduct the present value of the payments for the entirety of the contract term in the taxable year in which the taxpayer entered into the contract. Id. at 957-958.

[44]Champion Spark Plug Co. v. Commissioner, 30 T.C. 295, 297 (1958), aff'd, 266 F.2d 347 (6th Cir. 1959), involved a unilateral contract under which the taxpayer agreed to make semimonthly payments to a disabled former employee for a multiyear period. The Court found that the taxpayer was entitled to deduct the value of the payments to be made over the entire period in the taxable year in which the taxpayer entered into the contract. Id. at 298.

609; Helvering v. Russian Fin. & Constr. Corp., 77 F.2d at 327; Wash. Post Co., 405 F.2d at 1283. In contrast, the required performance under the agreements to which the disputed deductions relate was not supposed to occur, and in fact did not occur, until after the close of petitioner's TYE March 31, 2005.

One of the cases, Commissioner v. H.B. Ives Co., 297 F.2d at 229-230, is not relevant to the issues before the Court as it involves a deduction claimed for year 1 under a contract that was not executed until year 2.

The other case petitioner cites, Ill. Power Co. v. Commissioner, 87 T.C. at 1443-1447, actually supports respondent's argument that the fact of the liability is established upon the occurrence of either the required performance or the payment due date. Ill. Power Co. v. Commissioner, 87 T.C. at 1445, involved a lease agreement under which the taxpayer agreed to make lease payments either monthly, as the taxpayer's nuclear power plant became operational, or at the termination of the lease agreement, which would occur in 40 years. Id. The taxpayer elected to defer its lease payments for 1981 until the plant became operational; however, the taxpayer accrued an amount equal to its monthly lease obligation for 1981 and deducted the amount on its 1981 return. Id. at 1428, 1445. This Court upheld the claimed deduction, stating:

Whether the lease payments are made as Monthly Lease Charges, as the plant becomes operational, or as of the termination of the Lease Agreement, it is clear that in all events, the payments must be made. That petitioner elected to defer payments of the charges until the plant becomes operational is of no significance. The election merely affects the timing and not the certainty of payment of the accrued charge. * * *

Id. at 1445. Because the lease agreement provided that the taxpayer had an unconditional liability to pay the lease obligations as they accrued each month, the Court held that the taxpayer was entitled to deduct those obligations as they accrued even if the taxpayer did not pay the lease obligations until later. The holding is consistent with the general proposition that a taxpayer may deduct a liability as an expense before payment is made so long as the event fixing the liability (in Ill. Power Co., performance under the lease agreement) has occurred. See also Eastman Kodak Co. v. United States, 534 F.2d 252, 259-260 (Ct. Cl. 1976).

Although petitioner's execution of the agreements in issue does not establish the fact of the liabilities, the terms of the agreements are relevant in deciding whether and when the liabilities became fixed under the all events test. See supra pp. 38-39; see also Decision, Inc. v. Commissioner, 47 T.C. 58 (1966). We analyze each of the relevant agreements to identify the earlier of when the

required performance occurred or when petitioner's payment was unconditionally due.

### 1. Service Contracts

An accrual method taxpayer may not deduct an expense attributable to a bilateral service contract before performance of the services under the contract occurs. Nat'l Bread Wrapping Mach. Co. v. Commissioner, 30 T.C. 550, 556 (1958) ("The accrual method does not permit the anticipation of future expenses prior to the rendition of the services for which the payment is due."); Levin v. Commissioner, 21 T.C. at 998; Amalgamated Hous. Corp. v. Commissioner, 37 B.T.A. 817, 829 (1938), aff'd, 108 F.2d 1010 (2d Cir. 1940); see also Levert v. Commissioner, T.C. Memo. 1989-333; Rev. Rul. 80-182, 1980-2 C.B. 167.

### a. Marsh Agreement

The event fixing a liability under a service contract is the performance of the services. See, e.g., Levin v. Commissioner, 21 T.C. at 998. As relevant here, under the agreement Marsh agreed to provide VECO Corp. with various insurance brokerage and consulting services during the period from January 10 through December 31, 2005, in exchange for the payment by VECO Corp. of an annual fixed fee of $300,000. The $300,000 fee was payable in installments with $75,000

due on February 1, 2005, and four additional payments, totaling $225,000, due on dates either on or after April 1, 2005.[45]

The portion of the fee in dispute, $225,000, was not due under the agreement until on or after April 1, 2005. Accordingly, the $225,000 qualifies as an established liability during petitioner's TYE March 31, 2005, only if Marsh performed the required services under the agreement on or before March 31, 2005. Petitioner has failed to prove that Marsh provided all of the contracted-for services to VECO Corp. by March 31, 2005.

VECO Corp. was required to make a $75,000 payment for services rendered during the period January 10 to March 31, 2005, which petitioner properly deducted. However, VECO Corp. was not required to pay the $225,000 amount by March 31, 2005. As there is no credible evidence that either (i) the services required under the contract for the period after March 31, 2005, had been provided by March 31, 2005, or (ii) petitioner had an obligation to pay the $225,000 before March 31, 2005, the fact of the liability for the $225,000 petitioner deducted was not established by the close of petitioner's TYE March 31, 2005.

---

[45]The Marsh agreement does not provide for VECO Corp. to make payments in equal amounts. However, the payment schedule shows that VECO Corp. was to make payments of $75,000, or multiple amounts equal to $75,000, for each quarter. We infer from this payment schedule that VECO Corp. was to make payments to Marsh as the services were provided.

b.    ACS Agreement

Petitioner failed to introduce a copy of the service agreement between ACS and VECO Alaska or any other evidence to show the performance required of ACS under the contract.  While we infer from the record that ACS provided services to VECO Alaska, we are unable to make a finding as to whether performance under the ACS agreement had occurred by the close of TYE March 31, 2005.

We also infer from the record that VECO Alaska made monthly payments to ACS.  See supra note 16.  The parties agree that the disputed deduction is attributable to monthly expenses under the agreement for the period April 1 to December 31, 2005.  At best, payment of the expense generating the disputed deduction was not due until the beginning of each month and accordingly, was not unconditionally due until after March 31, 2005.  Petitioner has failed to show that the fact of the liability was established by the close of petitioner's TYE March 31, 2005.

c.    Schwamm & Frampton Agreement

Under the agreement Schwamm & Frampton agreed to provide property management services and to act as agent for VECO Properties, in exchange for monthly payments by VECO Properties that were due when it received rent for the

month.  The disputed deduction is attributable to expenses of $6,250 for services provided by Schwamm & Frampton in April 2005.  VECO Properties' payment of $6,250 was not unconditionally due until on or after April 1, 2005.

Neither the performance of the services nor the payment due date occurred before March 31, 2005.  Accordingly, the fact of the liability was not established by the close of petitioner's TYE March 31, 2005.

### d.  Otis Elevator Agreement

Under the agreement Schwamm & Frampton, as agent for VECO Properties, agreed to pay Otis Elevator a monthly service fee of $1,950.[46]  The terms of the agreement provided that payments would be made quarterly, with each quarterly payment made "on or before the last day of the month prior to the billing period,

---

[46]Respondent contends that petitioner is not entitled to a deduction for expenses under the Otis Elevator agreement because:  (1) neither VECO Corp. nor VECO Properties made any direct payments to Otis Elevator and (2) neither VECO Corp. nor VECO Properties was a party to the contract with Otis Elevator. Although neither VECO Corp. nor VECO Properties made any direct payments to Otis Elevator, petitioner is entitled to deduct expenses attributable to liabilities incurred during TYE March 31, 2005, such as the Otis Elevator monthly service fees.  See, e.g., United States v. Gen. Dynamics Corp., 481 U.S. 239, 243 (1987); United States v. Hughes Props., Inc., 476 U.S. 593, 599 (1986).  In addition, while neither VECO Corp. nor VECO Properties was a party to the Otis Elevator agreement, Schwamm & Frampton, the agent of VECO Properties, entered into the Otis Elevator agreement at the direction of VECO Properties.

beginning on the Commencement Date." The agreement further provided for a commencement date of February 1, 2002.

The disputed deduction, $16,575, was attributable to expenses under the Otis Elevator agreement for the period April 1 to December 15, 2005. Therefore, petitioner's liability for the amount was fixed only if payment of that amount was unconditionally due on or before March 31, 2005.

Under the agreement VECO Properties was required to make quarterly payments on or before January 31, April 30, July 31, and October 31. The advance payment due on or before January 31, 2005, was for services to be rendered during February, March, and April 2005. VECO Properties was not required to make another payment until April 30, 2005, at which time VECO Properties would pay for services to be rendered during May, June, and July 2005.

Because the obligation to pay for the services to be rendered during April 2005 was unconditionally due on January 31, 2005,[47] $1,950 of the disputed deduction, attributable to services provided in April 2005, was fixed during petitioner's TYE March 31, 2005. See, e.g., sec. 1.446-1(c)(ii)(B), Income Tax

---

[47]Petitioner is not entitled to treat this liability as incurred any earlier than the taxable year in which economic performance occurs. See sec. 461(h)(1); sec. 1.461-4(a)(1), Income Tax Regs. We discuss the economic performance requirement with respect to this liability in part II.C, infra.

Regs. The remaining disputed amount attributable to services provided from May 1 to December 15, 2005, however, was not fixed during TYE March 31, 2005, because payment for such services was not unconditionally due until after March 31, 2005.

### e. Q-1 Agreement

Under the agreement Q-1 agreed to provide maintenance services to VECO Properties and VECO Properties agreed to pay Q-1 a monthly fee of $9,984 "in arrears, on the tenth day of the following month." The disputed deduction, $59,940, relates to expenses incurred under the Q-1 agreement for services provided during the period April 1 to October 15, 2005. Neither the performance of the services nor the payment due date occurred before the close of petitioner's taxable year. Accordingly, the fact of the liability was not established by the close of petitioner's TYE March 31, 2005.

### 2. Insurance Premium Agreement

For purposes of the all events test, the deductibility of expenses under an insurance contract generally is reviewed in the same manner as the deductibility of expenses under a service contract. See, e.g., Rev. Rul. 2007-3, supra. Under VECO Corp.'s commercial premium finance agreement with Marsh, VECO Corp. agreed to make monthly premium payments beginning May 1, 2005, for coverage

during the period April 1, 2005, to March 31, 2006.[48]  Performance of the services did not occur and payment for the services was not due before March 31, 2005.  Accordingly, the fact of the liability was not established by the close of petitioner's TYE March 31, 2005.

### 3.    Equipment and Real Estate Rental Agreements

The fact of the liability of a rental expense is established as each rent payment becomes due.  Consol. Foods Corp. v. Commissioner, 66 T.C. 436, 443 (1976); see also Rod Realty Co. v. Commissioner, T.C. Memo. 1967-49.  Under all of the real estate rental leases, with the exception of the Bay Street lease, VECO Corp. or its subsidiaries agreed to make a rent payment for each monthly rental period either:  (1) on the first day of that month or (2) "on or before" the first day of that month.  The disputed deductions attributable to these leases relate to the rental of property on or after April 1, 2005.  Under the lease agreements the rent payments for April 2005 were not unconditionally due until April 1, 2005, and the rent payments for the remainder of 2005 were not due until after April 1,

---

[48]As noted supra pp. 37-39, the mere execution of a contract is insufficient to establish the fact of the taxpayer's liability.  Accordingly, petitioner may not rely on the existence of the insurance premium contract to support its claimed deduction.  Furthermore, VECO Corp. did not enter into the insurance premium contract until April 28, 2005, after the close of petitioner's TYE March 31, 2005.

2005. Accordingly, the fact of these liabilities was not established by the close of petitioner's TYE March 31, 2005.

Under the Bay Street lease VECO USA agreed to make monthly rental payments in advance of the first day of each month. The disputed deduction, $294,696, is attributable to the rental period April 1 to December 15, 2005. VECO USA's rent payment for April 2005 was due on or before March 31, 2005. Accordingly, the fact of the liability for the $33,990 rent payment for the period April 2005 was established before the close of petitioner's TYE March 31, 2005, because the rent payment was unconditionally due on March 31, 2005.[49] See, e.g., sec. 1.446-1(c)(ii)(B), Income Tax Regs. Petitioner is not entitled to deduct any amount attributable to rent for the period May 1 to December 15, 2005, because the rent payments were not due until after the close of petitioner's TYE March 31, 2005. Therefore, the fact of petitioner's liability for these payments was not established during petitioner's TYE March 31, 2005.

Under the IKON equipment lease VECO Services agreed to make monthly rent payments of $25,785, with the first payment due on or before the effective

[49]Petitioner is not entitled to treat the amount of this liability as incurred any earlier than the taxable year in which economic performance occurs. See sec. 461(h)(1); sec. 1.461-4(a)(1), Income Tax Regs. We discuss the economic performance requirement with respect to this liability infra part II.C.

date and the remaining payments due on the same day each month thereafter. Petitioner has failed to introduce evidence to prove the effective date of the IKON equipment lease. See supra note 32. Accordingly, we are unable to find that the rent payments for which the disputed deduction was claimed were due on or before March 31, 2005. Petitioner has failed to prove that the fact of its liability under the IKON equipment lease was established by the close of petitioner's TYE March 31, 2005.

### C. Economic Performance and the Recurring Item Exception

#### 1. Introduction

Section 461(h)(1) provides that "in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs."[50] If the liability is attributable to the provision of services or property to the taxpayer by another person, economic performance occurs as the person provides such services or property. Sec. 461(h)(2)(A)(i) and (ii); see also sec. 1.461-4(d)(2), Income Tax Regs. If the liability is attributable to "the use of property by the taxpayer, economic performance occurs as the taxpayer

---

[50]Sec. 1.461-1(a)(2)(iii)(B), Income Tax Regs., provides examples of liabilities that are not subject to the economic performance requirement, none of which is relevant here. See sec. 1.461-4(b), Income Tax Regs.

uses such property."[51]  Sec. 461(h)(2)(A)(iii); see also sec. 1.461-4(d)(3), Income

Tax Regs.  However, "a taxpayer is permitted to treat services or property as

provided to the taxpayer as the taxpayer makes payment to the person providing

the services or property * * * if the taxpayer can reasonably expect the person to

provide the services or property within 3-1/2-months after the date of payment."

Sec. 1.461-4(d)(6)(ii), Income Tax Regs.  Petitioner has conceded that it did not

satisfy the 3-1/2-month rule of section 1.461-4(d)(6)(ii), Income Tax Regs., for

any of the deductions in issue.[52]

---

[51]The economic performance principles relating to the provision of services or property to the taxpayer, or the use of property by the taxpayer, do not apply to certain liabilities, including, among other things, interest expenses and liabilities arising under a worker's compensation act or out of any tort or breach of contract claim.  See sec. 1.461-4(d)(1), Income Tax Regs.

[52]Sec. 461(h) also provides a general rule for economic performance, described supra p. 33.  Under the general rule, petitioner is entitled to deduct for TYE March 31, 2005, the payments it made during that year for services actually performed and property actually received during that year.  See, e.g., Caltex Oil Venture v. Commissioner, 138 T.C. 18, 38 (2012).  The only amounts in dispute are those attributable to deductions petitioner claimed on its TYE March 31, 2005, return for services performed and property received after March 31, 2005.  Accordingly, economic performance with respect to the portions of the deductions in dispute did not occur until after the close of petitioner's TYE March 31, 2005.  See sec. 461(h)(2)(A).

Section 461(h)(3) provides an exception (the recurring item exception) to the general rule requiring economic performance. Under the recurring item exception, a taxpayer may treat an item as incurred during any taxable year if:

      (i)     the all events test with respect to such item is met during such taxable year (determined without regard to * * * [section 461(h)(1)]),

      (ii)    economic performance with respect to such item occurs within the shorter of--

          (I)    a reasonable period after the close of such taxable year, or

          (II)   8 1/2 months after the close of such taxable year,

      (iii)   such item is recurring in nature and the taxpayer consistently treats items of such kind as incurred in the taxable year in which the requirements of clause (i) are met, and

      (iv)   either--

          (I)    such item is not a material item, or

          (II)   the accrual of such item in the taxable year in which the requirements of clause (i) are met results in a more proper match against income than accruing such item in the taxable year in which economic performance occurs.

Sec. 461(h)(3)(A); see also sec. 1.461-5, Income Tax Regs.

Respondent contends that petitioner failed to satisfy the economic performance requirement and the materiality or matching requirement of the

recurring item exception for all of the disputed deductions. Petitioner disagrees. In particular, petitioner contends that economic performance with respect to each expense item occurred within 8-1/2 months after the close of its TYE March 31, 2005, as specified in section 461(h)(3)(A)(ii)(II), and that each expense item is not material within the meaning of section 461(h)(3)(A)(iv)(I). Petitioner concedes that it did not satisfy the matching requirement for any of the disputed deductions, with the exception of its insurance premium expense deduction.

The deductions remaining at issue are the deductions claimed with respect to the Aspen, Primavera, Surveyor's Exchange, and Invensys agreements, and the deductions claimed with respect to services and property provided to petitioner during April 2005 under the Otis Elevator agreement and the Bay Street lease. We examine the record to see whether petitioner has proven that: (1) each item in dispute is not material, see sec. 461(h)(3)(A)(iv)(I), and/or (2) economic performance with respect to each item in dispute occurred within the shorter of a reasonable period after the close of petitioner's TYE March 31, 2005, or within 8-1/2 months after the close of petitioner's TYE March 31, 2005, see sec. 461(h)(3)(A)(ii).

2.      Materiality Requirement

In making a determination regarding the materiality of an item under section

461(h)(3)(A)(iv), the treatment of an item on financial statements shall be taken

into account.  Sec. 461(h)(3)(B).  Section 1.461-5(b)(4), Income Tax Regs., also

addresses the materiality requirement[53] and provides the following general

principles:

> (i) In determining whether a liability is material, consideration
> shall be given to the amount of the liability in absolute terms and in
> relation to the amount of other items of income and expense
> attributable to the same activity.

> (ii) A liability is material if it is material for financial statement
> purposes under generally accepted accounting principles.

> (iii) A liability that is immaterial for financial statement
> purposes under generally accepted accounting principles may be
> material for purposes of this paragraph * * *

We glean from these principles that although a liability is material for purposes of

the recurring item exception if it is material for financial statement purposes, a

liability that is not material for financial statement purposes may still be material

---

[53]The Financial Standards Accounting Board (FASB) defines materiality as "[t]he magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement."  Statement of Financial Accounting Concepts No. 2, "Qualitative Characteristics of Accounting Information" (1980) (SFAC No. 2).

for purposes of the recurring item exception.  See, e.g., United States v. Stover, 731 F. Supp. 2d 887, 892 (W.D. Mo. 2010), aff'd, 650 F.3d 1099 (8th Cir. 2011).[54]

Section 461 does not define when an item is material under the recurring item exception; it simply provides that in determining materiality, an item's treatment on financial statements must be taken into account.  Sec. 461(h)(3)(B). The legislative history accompanying the enactment of the recurring item exception, however, provides an example of how the materiality of an item should be analyzed:

> For example, assume that a calendar-year taxpayer enters into a one-year maintenance contract on July 1, 1985.  If the amount of the expense is prorated between 1985 and 1986 for financial statement purposes, it also should be prorated for tax purposes.  If, however, the full amount is deducted in 1985 for financial statement purposes because it is not material under generally accepted accounting principles, it may (or may not) be considered an immaterial item for purposes of this exception.

---

[54]A liability also is material if it is significant in amount.  See sec. 1.461-5(b)(4)(i), Income Tax Regs.; see also United States v. Stover, 731 F. Supp. 2d 887, 892 (W.D. Mo. 2010) (analyzing the amount of the expense, the relationship between the expense and the taxpayer's revenue, and the materiality of the amount and nature of the expense for financial statement purposes in deciding whether an expense was material under sec. 461(h)(3)(A)(iv)(I)), aff'd, 650 F.3d 1099 (8th Cir. 2011); Rev. Rul. 2012-1, 2012-2 I.R.B. 255.  However, the FASB has stated that "[m]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment."  SFAC No. 2.

H.R. Conf. Rept. No. 98-861, at 874 (1984), 1984-3 C.B. (Vol. 2) 1, 128; see also Staff of J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 263 (J. Comm. Print 1984).  We draw from section 461(h)(3)(B) and from the example a conclusion:  If a taxpayer prorates a liability arising under a contract over two or more taxable years for financial statement purposes but takes an inconsistent position on its tax returns, the liability is material.

Petitioner prepared its financial statements in accordance with GAAP.  On its financial statements petitioner accrued its liabilities under the Aspen, Primavera, Surveyor's Exchange, Invensys, and Otis Elevator agreements and the Bay Street lease over more than one year for financial statement purposes.  On its FYE March 31, 2006, financial statement, petitioner treated the disputed deductions as expenses for that year but deducted the expenses on its tax return for TYE March 31, 2005.  Guided by section 461(h)(3)(B) and the example in the conference report, we conclude that the liabilities giving rise to the disputed deductions are material because petitioner prorated the liabilities between two years on its financial statements and took an inconsistent position with respect to the liabilities for financial statement and tax reporting purposes.

Petitioner bears the burden of showing that the liabilities attributable to the disputed deductions are not material under section 1.461-5(b)(4), Income Tax Regs. Although petitioner contends that the liabilities were not material in amount for financial statement purposes, petitioner only introduced calculations that compare the disputed deductions to gross receipts. Petitioner neither offered any analysis regarding how the liabilities at issue compared in amount or relative importance to similar types of expenses nor addressed the fact that the disputed deductions resulted from a requested change in accounting method.[55]

Even if we were to find that the amount of the liabilities was immaterial for financial statement purposes, "[a] liability that is immaterial for financial statement purposes under generally accepted accounting principles may be material" for purposes of the recurring item exception. See sec. 1.461-5(b)(4)(iii), Income Tax Regs. The disputed items resulted from a change of accounting

---

[55]Additionally, the FASB has noted that an item that is too small in amount to be considered material may be material if it arises in abnormal circumstances. SFAC No. 2. The liabilities in dispute arose in abnormal circumstances, i.e., during the year in which petitioner proposed a change in its accounting method. Petitioner's treatment of the liabilities for tax purposes also shows abnormal circumstances given that: (1) petitioner did not treat the liabilities the same way for financial statement purposes and (2) petitioner's treatment of the liabilities as expenses for its TYE March 31, 2005, does not result in a matching of income and expenses since petitioner did not accelerate the income attributable to the accelerated expenses.

method, which was disclosed on petitioner's financial statement, and the disputed items were treated inconsistently for financial accounting and tax reporting purposes. In addition, the liabilities giving rise to the deductions were accrued over more than one taxable year. Under these circumstances, the liabilities generating the accelerated deductions were material for tax purposes.

Petitioner had the burden of proving that the disputed items were not material within the meaning of section 461(h)(3)(A)(iv)(I) and section 1.461-5(b)(4), Income Tax Regs., and it did not do so. Accordingly, we hold that petitioner may not use the recurring item exception to accrue and deduct its liabilities under the Aspen, Primavera, Surveyor's, Invensys, and Otis Elevator agreements, or its liability under the Bay Street lease, for periods after March 31, 2005, on petitioner's income tax return for TYE March 31, 2005. In the light of our holding, we need not consider whether the other requirements of the recurring item exception described in section 461(h)(3)(A) have been met.

III. Conclusion

Because neither the required performances nor the payment due dates with respect to the majority of the accelerated deductions occurred before the close of petitioner's TYE March 31, 2005, petitioner failed to satisfy the first requirement of the all events test of section 461; i.e., petitioner failed to prove that all of the

events had occurred to establish the fact of the liabilities under section 1.461-1(a)(2)(i), Income Tax Regs. With respect to the remaining accelerated deductions, petitioner did not satisfy all of the requirements for the recurring item exception under section 461(h)(3) and, consequently, is not excepted from the general rule of section 461(h)(1) requiring economic performance, because the liabilities underlying the deductions were prorated over more than one taxable year, were treated inconsistently for financial statement and tax purposes, and were material items for tax purposes within the meaning of section 461(h)(3)(A)(iv)(I). See sec. 1.461-5(b)(4), Income Tax Regs.

To reflect the foregoing,

Decision will be entered for respondent.